[Civ. No. 6011. Third Appellate District.—June 8, 1939.]

ISABELLE A. GOODSPEED et al., Plaintiffs and Appellants, v. GREAT WESTERN POWER COMPANY OF CALIFORNIA (a Corporation) et al., Defendants and Appellants.

Ware & Ware for Plaintiffs and Appellants.

Thomas J. Straub, W. R. Dunn, Eustace Cullinan and Jerome D. Peters for Defendants and Appellants.

THE COURT.—This is an action to recover damages arising out of alleged fraudulent representations made by defendants with respect to the sale of shares of stock. The issues were tried before the court, findings were duly entered in favor of plaintiffs upon all such issues, and judgment was rendered against defendants in the sum of $13,061.32. An appeal is taken from the judgment by defendants. Plaintiffs also appeal from "that part and portion of said judgment in which the trial court found, determined and adjudged that plaintiffs were not entitled to recover interest from defendants on interest payments, from the respective dates of payment, paid by plaintiffs and received by defendants on account of the purported purchase of stock of defendant Western Canal Company, one of which payments on account of interest was made on December 31, 1927, in the sum of $505.00, and another of which payments on account of interest was made on December 3, 1929, in the sum of $1,206.98, and another of which payments on account of interest was made on January 12, 1932, in the sum of $1,743.09."

The pleadings are exceedingly voluminous, but the essentials of the cause of action alleged are fairly simple in their outlines. The complaint alleges that at all times defendant power company was a corporation organized under the laws of the State of California, and a public utility during said times; that defendant canal company was and is a corporation organized under the laws of California, and "the wholly owned, operated and controlled creature and *alter ego* of defendant Power Company"; that defendants falsely and fraudulently represented to plaintiffs that defendant canal company was a mutual water company; that the only way plaintiffs could obtain irrigation water for their lands was to purchase a certain number of shares of the corporate stock of defendant canal company, and that said stock would be, at all times after it was issued, good and valid, and that the contracts for the purchase of the stock would be good and valid; that contracts for the purchase of said stock were executed by plaintiffs and defendant canal company, and that plaintiffs relied upon the truth of said representations in entering upon and executing said contracts; that said representations were false; that plaintiffs did not discover the falsity of said representations until the 31st day of October, 1932, on which date the Supreme Court of California adjudicated that at all the times mentioned in the complaint defendants and each of them were public utilities, and that defendant canal company never was a mutual water company.

It is also alleged that plaintiffs received nothing whatever because of the making of said contracts for the purchase of said stock and that said contracts were made without any consideration whatever, and that each of them now is wholly void and of no worth or value; and that the total amount paid for said stock under said contracts was $12,500, and that by reason of the facts alleged, plaintiffs have been damaged in said sum.

The answers of defendants put in issue all the foregoing facts, and in addition they set forth, very fully, certain facts to support the defense that they were acting in good faith throughout the entire transactions mentioned in the complaint.

The trial court found in favor of plaintiffs on all issues, in a voluminous document which takes up sixty-six pages of the transcript. Much superfluous evidentiary matter is set

forth. Such extended findings might be due to an abundance of precaution or to the numerous collateral issues which were presented.

Defendant canal company was organized January 28, 1915, as a mutual water company under the laws of the State of California. The articles of incorporation provide, in part, that the purposes for which said corporation is formed are: ''To supply water for irrigation and domestic use to the stockholders of said corporation, and only to said stockholders, for use on land owned or being purchased by said stockholders, aggregating approximately two hundred thousand acres situate in the counties of Butte, Sutter, Glenn and Colusa, State of California, within the area bounded on the east by the Feather and Yuba Rivers, on the west by the Sacramento River, and on the north by parallel number twenty (20) north, Mt. Diablo Base, and on the south by parallel number fifteen (15) north, Mt. Diablo Base.''

The by-laws of said corporation provided in part:

''It is hereby provided and made a part of the contract between this corporation and each and all of its stockholders, that from and after the purchase by any stockholder of this corporation of water from this corporation, and the use of such water upon lands within the area aforesaid which are owned or being purchased by such stockholder, as aforesaid, shares of stock of such stockholder equivalent in number to the number of acres, of such land, upon which such water is used, shall become appurtenant to such land.''

Plaintiffs were the owners of lands available for irrigation water under said articles and by-laws, and on April 30, 1927, they executed a contract with defendant canal company to supply water for irrigation purposes upon said land. The contract provided in part as follows:

''CONTRACT TO SELL WATER

Between

WESTERN CANAL COMPANY

And

MRS. ISABELLE A. GOODSPEED, a widow,    (I. A. G.
  VERA E. UPPHOFF                 V. E. U.
  and HUGO UPPHOFF her husband:     H. U.)

''THIS AGREEMENT, made this 30th day of April, 1927, between Western Canal Company, a corporation organized

and existing under and by virtue of the laws of the State of California, hereinafter called the Water Company, first party, and Isabelle A. Goodspeed, a widow, Vera E. Upphoff and Hugo Upphoff, her husband, of the County of Butte, State of California, hereinafter called the Consumer, second party—

WITNESSETH:

"First. That in consideration of the promises and covenants, and the due fulfillment thereof, on the part of the Consumer herein, the Water Company agrees, under the terms, conditions, limitations, and restrictions herein stated, to furnish during the irrigation season each year as herein defined, to the Consumer, water in the amounts hereinafter specified. Throughout this agreement the Consumer includes singular and plural, and if there is more than one second party, they are jointly and severally obligated hereunder, and the masculine includes the feminine and neuter gender.

"The quantity of water herein agreed, subject to the terms hereof, to be furnished by the Water Company to the Consumer shall be, and shall not exceed, such quantity of water as shall be required, when economically used, to irrigate a maximum of Nine Hundred Ninety nine and thirty seven hundredths (999.37) acres of Consumer's land, but in no event to exceed Six Thousand Nine Hundred Ninety-three (6993) acre feet of water per annum.

"The Consumer owns the following land situate, lying, and being in the County of Butte, State of California, and particularly described as follows:

"The South 83.72 acres of the south half of south half of Section 13, which lies west of Butte Creek; the south 115.65 acres of Section 14; the north half of Section 22; all of the north half of Section 24 which lies west of Butte Creek, 160 acres; and the North half of Section 23—all in Township 20 north, Range 1 East, and Aguas Frias Rancho; total acreage 997.37.

(I. A. G.
V. E. U.
H. U.)

"It is understood that the Consumer is to irrigate hereunder a minimum of Four Hundred Fifty (450) acres of said land, and has the right to increase the acreage up to Nine

Hundred Ninety-nine (999) acres as herein provided, and subject to the terms hereof.

"It is also hereby agreed that the Water Company shall not be obligated to furnish any water hereunder for use on any land until the Consumer has water-stocked such land as herein provided.

"The Water Company is a mutual water company and it is necessary for the consumer to become a member of the Water Company by becoming a stockholder, i. e., to acquire a share of stock of the Water Company for each and every acre of Consumer's land irrigated hereunder and to apply each such share to an acre of land and render such stock appurtenant thereto. The Consumer therefore shall immediately hereafter, or as soon as practicable designate to the Water Company the Four Hundred Fifty (450) acres of said land of the Consumer, and also such excess above Four Hundred Fifty (450) acres up to the maximum of Nine Hundred Ninety-nine (999) acres in all of Consumer's said land to be so water-stocked, and Consumer shall acquire as and when such designation or designations are made the proper certificates of stock containing the description of the land to which such stock is to be appurtenant; provided however that after xxxxx years from the date hereof no additional land of the Consumer shall be water-stocked without the written consent of the Water Company first obtained. . . . For the water herein agreed to be furnished, the Consumer in consideration of the premises, hereby promises and covenants to pay each year in Gold Coin of the United States to the Water Company or its assigns, at its offices, as follows:

"At the rate of Six Dollars per year for each acre of land irrigated during such year for raising rice; and Two Dollars per year, for each acre of land irrigated during such year for raising crops other than rice; Provided, however, that the Consumer shall each year pay in addition to the Six Dollars hereinabove specified, at the rate of one Dollar per acre foot for each acre of water delivered during such year for raising rice in excess of six acre feet on any acre of land; and in addition to the Two Dollars hereinabove specified at the rate of One Dollar per acre foot for each acre foot of water delivered during such year for raising any crop or crops other than rice in excess of two acre feet on any acre of land."

On the same day, April 30, 1927, the same parties executed a contract for the purchase of stock, which reads as follows:

"THIS AGREEMENT, made and entered into this 30th day of April, 1927, by and between Isabelle A. Goodspeed, and Vera E. Upphoff, first party, hereinafter called the 'Subscriber', and the Western Canal Company, a California corporation, second party, hereinafter called the 'Company',—

"WITNESSETH:

"That Whereas, the Company is a mutual company and sells water only to its stockholders; and

"Whereas, the Subscriber is desirous of acquiring capital stock of the Company upon the terms hereinafter set forth, it being a necessary condition to his right to take water from the Company, that such stock be acquired, and it being hereby understood and agreed between the parties hereto that the rights, and each of them, of the Subscriber under any water contract are conditional upon, and exist only during the fulfillment by the Subscriber of each and all obligations, promises and agreements of the Subscriber hereunder.

"NOW THEREFORE, the parties hereto hereby agree as follows:

"If the Subscriber is more than one person, the promises and obligations of the Subscriber hereunder are joint and several promises and obligations.

"The Subscriber hereby subscribes for and promises and agrees to take, purchase and pay for Four Hundred Fifty (450) shares of the capital stock of the Company, at the price of Thirty Five Dollars ($35.00) per share, to-wit, the sum of Fifteen Thousand Seven Hundred Fifty ($15,750.00) payable as follows:

"Two Dollars and fifty cents ($2.50) per share upon the execution hereof, Two Dollars and Fifty cents ($2.50) per share on or before the first day of January, 1928, and the balance of purchase price, to-wit, the sum of Thirteen Thousand Five Hundred Dollars ($13,500.00) payable in twelve (12) annual installments of Eleven Hundred Twenty-five Dollars ($1125.00) each, the first of said installments being payable on or before January 1, 1929, and one of said installments being paid on or before the first day of January each and every year thereafter, until the said sum of Thirteen Thousand Five Hundred Dollars ($13,500.00) is fully paid with interest on deferred payments of such purchase price

from the date hereof, at the rate of 6% per annum, payable annually on the first day of January, each and every year commencing the first day of January, 1928, provided that if default be made by the Subscriber in the payment of any of the principal or interest as herein provided, then, at the option of the Company, the entire unpaid principal sum of said purchase price, and all interest accrued shall immediately become payable. The Company in consideration of the said subscription and promises of the Subscriber, hereby promises and agrees to cause to be transferred to the Subscriber said Four Hundred Fifty (450) shares of said stock, upon full payment of the purchase price thereof, and interest thereon, as above provided, said stock to be and become appurtenant to, and to run with the land belonging to the Subscriber, one share of said stock to become appurtenant to each acre of land, said land being described as follows:

"A part of the N½ of Section 22, containing 310 acres, and parts of the W½ of Sections 23 and 24, containing 140 acres, making total acreage to be waterstocked of 450 acres, more or less, being the same number of acres as above mentioned number of shares of water stock hereby subscribed for all in Aguas Frias Rancho and in Township 20 North, Range 1 East.

"It is understood by both first and second parties that this Fall an accurate survey will be made of lands waterstocked and an adjustment made accordingly.

"This agreement, and each and all of the terms and provisions hereof, shall govern and bind and run in favor of the parties hereto.

"WESTERN CANAL COMPANY
"(By (Signed) W. H. SPAULDING
"(SEAL)                                        President
"(By (Signed) L. A. REYNOLDS,
"Asst. Secretary.

"ISABELLE A. GOODSPEED (Signed)
"Subscriber.
"VERA E. UPPHOFF (Signed)."

On January 1, 1928, the same parties executed a contract substantially the same as the two last mentioned, providing for the purchase of 921 shares of stock at $25 a share. (This contract, according to the evidence, superseded the other stock purchase contract mentioned above, and was the one which

the parties acted. upon and carried out.) This contract was not. actually *delivered* until December 13, 1929. Water deliveries were duly made to plaintiffs by defendant canal company, and payments were made on said stock for several years without any question having been raised by plaintiffs as to the legality of such transactions. On December 21, 1931, upon complaint of Sarah E. Ludy against Western Canal Company (one defendant herein), and after an extended hearing, the railroad commission of the State of California, found that the canal company was in fact a public utility and not a mutual water company, and ordered said corporation to file rates and regulations with the commission covering irrigation water service for lands served under its canal system. On October 31, 1932, the order of the commission was upheld by the Supreme Court. (*Western Canal Co.* v. *Railroad Com.*, 216 Cal. 639 [15 Pac. (2d) 853].) It was these proceedings, the trial court found, which first brought to the attention of plaintiffs the facts as to the true corporate character· of the canal company.

Following the adjudication by the railroad commission and Supreme Court to the effect that defendant canal company was a public utility and not a mutual water company, this action was commenced.

■ The nature of the cause of action is the subject of considerable discussion in the briefs of both parties. We are of the opinion that this question was definitely settled by this court when the case was before us upon an appeal from an order denying the motion of defendants for a change of venue. (*Goodspeed* v. *Great Western Power Co. et al.*, 135 Cal. App. 687 [27 Pac. (2d) 937].) We there said:

"The complaints are quite lengthy but it is only necessary for the purpose of this appeal to refer to the facts involving venue. The actions are for recovery of damages for fraud. It is alleged that the Western Canal Company was a corporation wholly owned, operated and controlled by the Great Western Power Company, a corporation, and that the two corporations were public utilities for the purpose of furnishing water for the irrigation of lands within the area where lay the lands of the two plaintiffs.

"The alleged fraud consisted in inducing plaintiffs to make payment of money to defendant Western Canal Company on the alleged false and fraudulent representations that de-

fendant Western Canal Company was a mutual water company, and that plaintiffs could not get water from the company except by purchase of its capital stock, the same to become appurtenant to the lands to be irrigated and that water would not be furnished plaintiffs unless they so became stockholders. It is then alleged that plaintiffs entered into such contracts to buy stock, make payments upon account thereof, and that they received nothing of value and have been damaged thereby.''

Respondents contend that the recovery can be justified upon two grounds; first, that defendants were guilty of actual fraud, arising out of the fraudulent representations mentioned above; and second, that defendants were guilty of constructive fraud in selling stock in a public utility without a permit from the railroad commission of California, and in contravention of section 5, subdivision (d) of Act 6386, General Laws of California, which provides in part as follows:

'' (d) All stock and every stock certificate or other evidence of interest or ownership, and every bond, note or other evidence of indebtedness of a public utility, issued without an order of the commission authorizing the same then in effect shall be void.''

It will be noted, however, that only one cause of action is set forth in the complaint, which is based entirely upon fraudulent representations. It is alleged in the complaint that defendants fraudulently represented ''that said stock would be at all times after it was issued good and valid stock and that the said contracts to purchase the same would at all times after their execution be good, valid, lawful and binding contracts''. It is further alleged:

''That pursuant to the said fraudulent plans and purposes of defendants, as aforesaid, neither of them obtained, and no one obtained at any time, any permission from the Railroad Commission of the State of California to enter into either of the contracts hereinbefore referred to or to issue or to sell or to agree to sell any stock in said Canal Company, and no permission or ratification by the said Railroad Commission of the execution of either of said contracts herein referred to was ever had or obtained, and that said Railroad Commission never at any time upon any terms or conditions whatsoever authorized the execution of any contract in any

form whatever for the sale of any stock whatever in said Canal Company.''

It appears to us that but one cause of action is alleged, and that the allegation relating to the fact that no permission of the commission was secured was made in connection with, and to substantiate the allegation of the falsity of the representation made to the effect that the contracts were ''good, valid, lawful and binding''. It cannot be said, therefore, that the judgment can be sustained solely upon the sale of stock without a permit. Rather, it is predicated upon false representations made in respect to the validity of the stock. It was for this reason that we held in the case of *Goodspeed* v. *Great Western Power Co.* (above), that the alleged fraud consisted in inducing plaintiffs to make payments of money to defendants Western Canal Company ''on alleged false and fraudulent representations''. In that appeal respondents stated the nature of the action to be as follows:

''In both of these actions the plaintiffs are seeking to recover damages alleged to have been sustained by them and resulting from fraud practiced upon them by the defendants in the execution of the contracts made by the respective plaintiffs and defendants for the purchase of capital stock in defendant Western Canal Company.''

The parties devote much time to this phase of the case, but to us the essentials of the complaint are not so complicated or involved. A reading of the entire pleading leaves no doubt in our minds that the gravamen of the action is alleged false representations for which damages are sought, and it cannot be considered or regarded solely as an action to recover the amount paid for stock issued without a permit from the railroad commission, and that any reference in the complaint to the lack of such permit was made incidentally and in conjunction with the main cause of action. Moreover, we are satisfied that the case was tried upon the theory that it was one for damages arising out of fraudulent representations. Even though it is assumed that the complaint states a distinct cause of action based upon the theory that the stock was void through want of a permit, everything which we have to say later in this opinion as to the indivisibility of the contracts is nevertheless applicable.

The following is a summary of the representations found by the trial court to have been fraudulently made by defendants:

That the canal company was a separate and independent corporate entity;

That it was a mutual water company;

That it could and did serve water only to stockholders;

That it was necessary to buy stock in it in order to get water;

That it had a right to sell stock;

That its stock, so sold, was good and valid stock.

Considering the appeal by defendants, while the contentions are extremely numerous, in reality they are based upon two fundamental questions: ▉ First: Was defendant canal company, at the time when the contracts were entered into by these parties, and when it represented it was a mutual water company, a public utility under the laws of the State of California? And secondly: If it was, did it know that it then was a public utility and not a *bona fide* mutual water company? If the record supports an affirmative answer to both of these questions, a cause of action was proven.

In view of the first fundamental question mentioned above, it is the contention of respondents that the status of defendant canal company, as a public utility had, prior to the trial, been conclusively determined and adjudicated by the railroad commission, and the Supreme Court of this state and the Supreme Court of the United States. The proceedings in the Ludy case, before the commission (mentioned above), were admitted in evidence. The ultimate finding of the commission is as follows:

"I find, therefore, that the defendants herein, Western Canal Company and Great Western Power Company of California, own, control and operate their properties and water rights for the furnishing of water for irrigation and domestic uses for compensation and as public utilities within this State, and that said defendant Corporations are 'water corporations within the definition and meaning of that term as used in the Public Utilities Act and the Act for the Regulation of Water Companies in the State of California.''

This finding was taken to the Supreme Court by *certiorari*, and the finding was upheld, and an order directing defendants to file rates and regulations covering irrigation service

was affirmed. Referring to orders of the railroad commission, and the matter of their finality, the following excerpts from the case of *People* v. *Lang Transp. Co.*, 217 Cal. 166, 169, 170 [17 Pac. (2d) 721], is pertinent:

"The proceeding before the Commission was in the nature of a proceeding *in rem*. The Commission exercises judicial powers and its final determinations within its jurisdiction have the formality of judgments of courts of record. Within its limited sphere its final determinations and orders with reference to the condition or relation of the defendants may well be as conclusive as the judgment of a court under subdivision 1 of Section 1908 of the Code of Civil Procedure."

The foregoing follows the general rule laid down in Freeman on Judgments, volume 3, page 2617, 5th edition:

"As a general rule, whenever any person or persons have authority to hear and judicially determine any question, their determination is, in effect, a judgment having all the incidents and properties attached to a similar judgment pronounced in any regularly created court of limited jurisdiction acting within the bounds of its authority. Hence, whenever any board, tribunal, or person is by law vested with authority to decide a question, such decision, when made, is *res judicata*, and as conclusive of the issues involved in the decision as though the adjudication had been made by a court of general jurisdiction."

Defendants contend that this adjudication *in rem* might fix their status as of the date of the initiation of the proceedings before the commission—March 31, 1930—but that it does not relate back to the time when the representations were made and the first purchase of stock—April 20, 1927. The findings of the commission upon the entire evidence presented at the hearing read as follows:

"From the entire evidence presented concerning the water operations of these defendants, it must be found that the Great Western Power Company of California holds its property and water rights subject to the public use for irrigation and domestic purposes, and that this defendant is primarily responsible for the continuance of that public service. The Western Canal Company is not a mutual water company as defined in the Act for Regulation of Water Companies, and, doubtless, were it standing alone, would not be exempted from the Commission's regulation. It is vested with the legal

title to a canal system, a part of which was from the beginning impressed with the public use. But the fact cannot be overlooked that it is wholly a creation of the Power Company, and a device by which the latter has sought to escape its public obligation. The Canal Company owns no water rights, and without these its public utility function must be limited to a mere water transporting agency. But even in this respect, it is only a corporate fiction. Its title to the canal system is only a nominal title. The original purchase price, as seen above, was paid by the Power Company, and all additions thereto have been made by the latter. The Power Company holds all water rights, not only those purchased from the Old Feather River Company, but others acquired in part by the exercise of the right of eminent domain, and necessarily, therefore, devoted to the public use. Moreover, the water service actually rendered during the past fifteen years must be deemed to have been rendered by the Power Company alone, by reason of its complete domination and control over the property and affairs of its subsidiary corporation.''

''The existence of a public utility within the meaning of the law is in its essence a pure question of fact.'' (*Western Canal Co.* v. *Railroad Com.* (above), page 645.) ''Findings of fact by it, (the Railroad Commission), are to be accorded similar weight to that given verdicts of juries.'' (*Western Canal Co.* v. *Railroad Com.* (above), page 646.) We are of the opinion that these findings can be reasonably construed to apply to the status of defendants, not only at the time of the initiation of the proceedings, but at all times during which they or their predecessors offered for sale and sold water for irrigation service. Every fact and circumstance upon which the opinion of the commission is based, antecedes the date when the representations were made and the contracts for the sale of the stock were executed. This is likewise true of the opinion of the Supreme Court when the matter was before them. Furthermore, we are satisfied that there is ample evidence in the record before us to sustain such a finding. We are not permitted under such circumstances to set aside the verdict of a jury. Neither can we, under the rule stated above, interfere with a finding of the railroad commission made in the exercise of its lawful jurisdiction. The trial court here found that defendants were, at the time

the representations were made and the stock sold, public utilities, and this finding is subject to the same rule. We are satisfied it has sufficient evidentiary support.

Referring to the second fundamental question, many facts are set forth in the answers in support of the defense that defendants acted in good faith, and hence, there was no fraud. The trial court found that the representations mentioned above were made by defendants, and this finding is not questioned. The further finding that the representations were made fraudulently, and with intent to deceive is, however, vigorously attacked by defendants. From an examination of the record in the Ludy case before the commission, and from the record here, it appears that the evidence is substantially the same in each on the question of the status of defendants. On the matter of the real nature of activities of defendant canal company, the court, in the Western Canal case (above) has this to say:

"The Canal Company thus is made but an outlet for the sale of the stored waters of the Power Company at a profit, first in the sale of the stock and, secondly in the sale of the water. The Canal Company has no possible chance of independent existence at any time, not even after a sale of all its stock by the Power Company, which fixes the price. Then, too, its obligation to pay for water it may never sell will keep it in serfdom for an untold period of time. Sixteen years of struggle finds it more deeply enthralled than in the beginning. In practical operation its status as an independent *ego* is even worse than these contracts would indicate. Practically all its officers have come from the administrative force of the Power Company and get their salaries from the latter company. The office equipment and location of both companies is the same. The home and fortune of the Canal Company, in short, is within the keeping of the Power Company. The Canal Company has no bank account apart from the Power Company. The Power Company owns eighty-four per cent of the stock of the Canal Company and, as such owner, dictates the latter's every act. This stock, too, is pledged as an asset of the Power Company to secure its own indebtedness. The Canal Company has no independent bookkeeping system recording its sales or the status of its contract or water accounts. No land-owning stockholder has ever been notified of or attended a meeting of the stockholders; only about four regular

stockholders' meetings have been held in sixteen years. No stockholder without interest in the Power Company in some form has ever been on the board of directors of the Canal Company. The stock used to qualify the directors of the Canal Company is endorsed in blank to the Power Company. While the Canal Company has an appropriate set of by-laws, suitable for the management of a mutual water company, these by-laws have been in disuse. Instead of giving the Canal Company some voice over the price of its own stock, the Power Company provided a minimum and not a maximum price of $15.00 per share and some stock has been sold for as high as $35.00, the Canal Company being entirely and supinely helpless in this important matter. In short, the Canal Company has no voice in anything and its obligations to the parent company are increasing, with no signs of emancipation. Much further evidence of impotency of the Canal Company could be cited.

"But it is claimed that the holding of this court in *Thayer* v. *California Dev. Co.*, 164 Cal. 117 [128 Pac. 21], would justify the conclusion that the Canal Company exists as a mutual water company. It is true that there are some points of superficial similarity in the two cases but there are at the same time marked differences in the organizations under consideration. In the Thayer case the court found as a fact, contrary to the situation here, that the mutual company had not been controlled or dominated by the development company. The domination here is complete. In the Thayer case the stock of the mutual company was sold for its own benefit; here, the stock is sold for the exclusive benefit of the Power Company. In that case the mutual company did not, as here, give the parent company its whole capital stock and allow said company to pledge and traffic in it at will. Neither in the Thayer case, as here, was the Power Company authorized to stop the sale of stock at any time and thus be relieved *pro tanto* of the duty to furnish water. Neither in that case was the mutual company required to make water contracts at rates fixed by the parent company, as is the case here, nor did the mutual company there surrender bodily its management to the Power Company. . . . We think the Railroad Commission was well warranted in looking beyond the corporate forms which clothed the acts of petitioners and in declaring

the Canal Company to be but the agent of the Power Company.''

The trial court, the commission, and the Supreme Court all found that the canal company was under the complete domination and control of the power company. The trial court said: ''That at all times referred to in plaintiffs' complaint, defendant Canal Company was, and ever since has been, and now is, a corporation, organized and existing under the laws of the State of California, and said Canal Company was organized and created by the predecessor in interest of the Power Company, and at all times thereafter was, and now is maintained, operated and controlled by said predecessor and the Power Company, and has been at all of said times in conjunction with, and as the owned, operated and controlled creature and *alter ego* of said predecessor and the Power Company, a public utility for the purpose and charged with the necessity of furnishing water for irrigation, as aforesaid;'' The commission said: ''It (the Canal Company) is wholly a creation of the Power Company.'' The Supreme Court stated,—(Western Canal Co. case, above): ''The Canal Company thus is made but an outlet for the sale of the stored waters of the Power Company as a profit first, in the sale of stock, and secondly, in the sale of water. The Canal Company had no possible chance of independent existence at any time; not even after a sale of all its stock by the Power Company, which fixes the price. . . . In short, the Canal Company has no voice in anything, and its obligations to the parent Company are increasing, with no signs of emancipation.''

It would prolong this opinion to an excessive degree if we elaborate upon the various facts appearing in the record which lead to the foregoing conclusions by three independent tribunals. Some of them are set forth in the excerpt from the opinion of the Supreme Court above. The facts in the record are so cogent and convincing that the conclusion is inescapable that there is sufficient evidence in the record to sustain the following finding of the trial court on the matter of the fraudulent representations:

''That each and all of the representations so made by defendants were positive assertions and were not warranted by the information of defendants so making the same, and defendants had no reasonable ground for believing them, or any of them, to be true; that defendants had at hand the means,

and were, at all of said times charged with the responsibility of knowing that said statements were untrue; that at the time said representations and statements were made, as aforesaid, and at all times mentioned in plaintiffs' complaint, after they were so made and continuously to the present time, the same were, and each of them was, and they are now wholly false and untrue; that said Canal Company was not, at the time said representations were made, and never has been, and is not now, a separate and independent corporate entity or separately and independently engaged in the sale and distribution of water for irrigation, or a mutual water company;''

The facts and circumstances are sufficient to justify the inference and conclusion that defendant canal company, through its officers, knew, during all the times mentioned, that it was not operating freely as a *bona fide* mutual water company under the laws of this state, but that it was at all times nothing more than a corporate fiction, completely dominated by the power company,—a public utility. This being the truth, the representation that the canal company was a mutual water company was clearly ''the suggestion, as a fact, of that which is not true, by one who does not believe it to be true'',— (sec. 1710, Civ. Code),—a fraudulent deceit which entitled the aggrieved party to any damage caused thereby. (Sec. 1709, Civ. Code.) ■ A brief reference to some of the facts which justifies the conclusion relating to the real status of the canal company is as follows: Title to the physical properties of the canal company and all improvements made thereon, were paid for by defendant power company. The officers of the canal company were also officers and employees of the power company. In an agreement between the defendants, all of the 200,000 authorized shares of stock in the canal company, except 5,000, were to be issued to the power company. The price for which the canal company could sell its stock was fixed in the latter agreement. The stock sold by the canal company was actually owned by the power company. It was voted, pledged and listed as an asset of the power company. No land-owning and water-using stockholder ever attended a directors' or stockholders' meeting of the canal company, nor was any meeting of the stockholders held from February 5, 1915, to August 1, 1927. These are only a few of the many facts and circumstances in the record which would justify a finding to the effect that the

canal company never was a *bona fide* water company, and was only distributing agent for the power company,—a public utility,—and that its officers knew that to be a fact when they represented that they were a *bona fide* mutual water company and that the stock was good and valid.

Faced with the factual situation outlined in the preceding paragraph, defendants contend that the corporate setup and relations between them has been condoned by our courts, and that certain decisions have upheld the corporate entity, legality and independence of a mutual water company thus organized and conducted, and that whatever was done was therefore performed in good faith, and in reliance upon the pronouncements of the courts of this state. The chief authority urged in support of this defense is the case of *Thayer* v. *California Dev. Co.*, 164 Cal. 117 [128 Pac. 21]. The same contention was raised in the Western Canal Company case, above, and we rest upon the disposition made of the point in that case. (See quotation from this case above.) The most that can be said of evidence of this character—tending to prove good faith —is that it creates a conflict. On the other side are the facts and circumstances we have enumerated. The trial judge resolved this conflict in favor of plaintiffs, and on appeal we are foreclosed from further inquiry. Concluding our discussion of this phase of the case we hold that the finding of fraud has ample support in the record, and that the trial court properly decreed that the contracts for the sale of stock in the canal company and the stock issued to plaintiffs were fraudulent and void.

In arriving at a conclusion upon this ground of appeal, we have taken the view that the findings of the commission upon the status of defendant canal company is final and conclusive. As to whether or not defendants were guilty of fraud, that issue must be determined solely from the record before us, as the commission clearly has no jurisdiction to try a civil action arising out of a tort. The references and quotations here made from the decision of the commission and the opinion of the Supreme Court are facts and circumstances which were necessary to these adjudications, and which, on the other hand, might also be relevant and pertinent to the issue of fraud. Upon all such issues we have confined ourselves solely to an examination of the record before us. We see no reason, however, why a finding of

the commission, which has legally and finally adjudicated one of the issuable facts, should not be used to establish such fact, although it appears that such fact is part of the factual structure of plaintiffs' case involving fraud. It is contended by defendants that the rule is otherwise, and that the *issue of the status* of the canal company must be retried and determined here, irrespective of the previous adjudication of that issue by the commission and the Supreme Court of this state. It is conceded by all parties that the decision of the commission has the effect of a judgment *in rem,* but defendants argue that the instant action is one *in personam,* that therefore the commission's findings cannot be invoked by plaintiffs. Such a rule would, we believe, lead to the utmost confusion. If the judgment of the commission, acting within its jurisdiction, is final, it is final for all purposes and in any character of action or proceeding where the precise matter is again presented for adjudication before any other tribunal, board or commission. So when the parties here went into court they should have proceeded upon the assumption that this issue—the real corporate character of defendant canal company—was no longer open to litigation. The fact that plaintiffs presented evidence on the issue is of no consequence. If the trial court had here found that defendant canal company was not, and never had been a public utility, it would have been our duty to set aside any judgment based thereon, upon the ground that that issue had been conclusively adjudicated to the contrary by the commission. To hold (as defendants would have it) that the canal company was, as against the world, a public utility, but as between these parties it was a *bona fide* mutual water company, would result in the creation of a corporate Janus, — something unknown in law.

The second matter to be considered is that of damages. As we have pointed out, on the same date when the *first* contract for the sale of stock was made, the parties executed another contract for the delivery of water upon the lands of plaintiffs. Although this water contract was an exhibit in the case upon the part of plaintiffs, it was entirely ignored in the findings. It is set forth, in part, above. At the trial defendants offered the water contract in evidence in connection with the issue of damages, and further offered to prove the reasonable value of all irrigation water delivered to plaintiffs upon said contract, upon the theory that such

contract and the stock purchase contracts came under the provisions of section 1642 of the Civil Code, which provides that "several contracts relating to the same matters between the same parties, and made as parts of substantially one transaction, are to be taken together". The proffered proof showed that the *contract* price of water was substantially lower than the *reasonable value* of such water. Defendants therefore contend that the contracts for the sale of "water stock" were part of the consideration for the fixing of rates which were less than the reasonable value of the irrigation water, and if the stock purchase contracts were voided, and they are compelled to return to plaintiffs all moneys paid for the stock, plaintiffs should not be entitled to retain the benefit of the lower rates under part of the transaction, and yet receive full benefit from another part of the transaction, to wit: a return of the full price paid for the stock. In other words, defendants contend that they should be allowed to offset the benefit received by plaintiffs, against the detriment, where the several contracts were in fact but one transaction. The question is, therefore, did the trial court err in refusing the proffered evidence?

In the case of *Lynch* v. *Bank of America Nat. T. & S. Assn.*, 2 Cal. App. (2d) 214-222 [37 Pac. (2d) 716], this court held that where the language of two instruments indicated that they were intended to become a part of one transaction, they should be construed together. Quoting section 1642 of the Civil Code (above) we said: "The rule that separates written documents between the same parties and relating to the same subject-matter as indicated by the language contained therein, or satisfactorily proved by the circumstances under which they were executed, are to be construed together as one transaction, has been determined by so many authorities, there is no room for controversy regarding that principle. (*Burleson* v. *Northwestern Mut. Ins. Co.*, 86 Cal. 342 [24 Pac. 1064]; *Hawes* v. *Lux*, 111 Cal. App. 21 [294 Pac. 1080]; 6 Cal. Jur. 298, sec. 181; 13 C. J. 528, sec. 487; 6 R. C. L. 850, sec. 240.) This rule applies even though the separate written instruments were not executed on the same date." Applying this rule to the case here, all the facts and circumstances clearly indicate that the stock purchase contracts and the water agreement were dependent, one upon the other, and constituted but one transaction.

The stock purchase contracts here under attack, each contain the following language:

"WHEREAS the Subscriber is desirous of acquiring capital stock of the Company, upon the terms hereinafter set forth, it being a necessary condition to his right to take water from the Company, that such stock be acquired, and it being hereby understood and agreed between the parties hereto that the rights, and each of them, of the Subscriber under any water contract are conditional upon, and exist only during the fulfillment by the Subscriber of each and all obligations, promises and agreements of the Subscriber hereunder;"

The water purchase contract provided as follows:

"The Water Company is a mutual water company and it is necessary for the Consumer to become a member of the Water Company by becoming a stockholder, i. e., to acquire a share of stock of the Water Company for each and every acre of Consumer's land irrigated hereunder and to apply each such share to an acre of such land and thereby permanently to water-stock such land and render such stock appurtenant thereto. The Consumer therefore shall immediately hereafter, or as soon as practicable designate to the Water Company the Four Hundred Fifty (450) acres of said land of the Consumer, and also such excess above Four Hundred Fifty (450) acres up to the maximum of Nine Hundred Ninety-Nine (999) acres in all of Consumer's said land to be so water-stocked, and Consumer shall acquire as and when such designation or designations are made, the proper certificates of stock containing the description of the land to which such stock is to be appurtenant; provided, however, that after xxxxx years from the date hereof no additional land of the Consumer shall be water-stocked without the written consent of the Water Company first obtained."

Certainly, after reading these provisions, it cannot be doubted that the two matters—stock and water—were essentially "parts of substantially one transaction". Other circumstances are equally compelling. The testimony of both plaintiffs indicates clearly that the primary consideration was the securing of water for their lands. Plaintiff Upphoff testified as follows:

"Q. As a matter of fact the only thing you were interested in was the water, isn't that a fact? A. Yes. Q. That is all your mother was interested in, wasn't it? A. Yes."

The record can bear no reasonable construction other than that the stock contract would never have been executed unless the agreement to purchase water was also made. This question was presented, in a modified form to the Supreme Court in a companion case to *Western Canal Co.* v. *Railroad Com.* (above), — *Carlson* v. *Railroad Com.*, 216 Cal. 653 [15 Pac. (2d) 859], where it is said:

"The petitioners in this proceeding are stockholders and purchasers of stock of the Western Canal Company. They seek, by writ of review, an annulment of the order of the Railroad Commission considered in the above mentioned case, upon all the grounds stated therein, and upon the additional ground that they have obtained or are obtaining their stock in said Western Canal Company at a cost to them in excess of $500,000, in order to obtain a supply of water for irrigating purposes at cost and, if the order of the Railroad Commission is permitted to stand, it will wholly nullify said investment and will compel these petitioners to pay rates far in excess of the actual cost of service; that the properties of the Western Canal Company are extremely valuable and the rates which would be required to earn a reasonable return upon the fair value thereof would far exceed the present cost to petitioners of their required irrigation service, plus any interest on their investment which they might reasonably expect to receive as stockholders; that, therefore, said order takes from them their private property for public use without prior compensation therefor and impairs the obligation of the contracts between them and the Western Canal Company. In its opinion and order, the Railroad Commission had in mind the above contention and considered the inequality of petitioner's position as large investors in the stock of the Canal Company should the Commission fix a rate for water use applicable to stockholders and nonstockholders alike. But the Commission concluded that this situation could not affect its determination of facts in the proceeding before it, although in a proceeding for the fixing of rates, it might consider the equities advanced by every consumer. The opinion further stated that if there were any doubt as to the rights of petitioners as stockholders to share in the profits of the utility's operations, that matter

was for the civil courts to determine, but that if equity required an adjustment of rates to compensate for their contribution to capital, the Commission would, no doubt, be empowered to make such an adjustment. (*Live Oak Water Users Assn.* v. *Railroad Com.*, 192 Cal. 132 [219 Pac. 65].)''

In the case of *Albin* v. *Railroad Com.*, 216 Cal. 655 [15 Pac. (2d) 860], another companion case to the Western Canal Company case, the court says (in answer to the contention of a shareholder that he had invested large sums of money as a stockholder in Western Canal Company):

''At most these stockholders have paid their money to get a fixed amount of water at a fixed rate for use upon their lands. Under the order of the Commission they will get the needed amount at a regulated cost. Whether they will gain or lose by the process does not appear, but there is no reason to suspect that they will fare worse. Moreover, they can be heard at the rate-making hearing when their right to preferential consideration can be considered. Again, failure to ask a rehearing of the Commission's order before it became effective precludes relief in this court.''

Obviously, unless the water contract and the stock contract together constituted one indivisible transaction, that is unless the stock purchase was part of and incidental to the contract for water service, the railroad commission and the Supreme Court could not have sanctioned such an adjustment by which plaintiffs were compensated by special concessions with respect to water rates and service for the contributions made in payment for the shares alleged to have been invalid. If, in fact (as appellants sought to prove), by purchasing the stock, plaintiffs received something more than the stock itself, to wit, water at a rate under its fair market value, defendants were entitled to make such proof in connection with the damages which plaintiffs claimed. We believe, in all fairness and justice, that the entire transaction should have been revealed, and that the evidence on this phase of the case should not have been thus narrowly confined to only that which would benefit plaintiffs. Thus, in computing the damages if the reasonable value of the water was $9 per acre, and by virtue of the stock purchase plaintiffs purchased it at $6 per acre, the benefit of a reduction amount to $3 per acre should be set off against the amount paid for stock. Evidence of such reasonable value would be charges for similar services under similar conditions.

Contending that the rule under discussion is not applicable, respondents urged that the contracts are "separable and severable because of the nature of the transaction. The stock purchase contract being void, they (plaintiffs) got nothing under it, and the consideration wholly failed." But appellants overlook the fact that what they actually received under the stock contract was an issue—and a very vital one—in the case, and the proffered evidence bore directly upon that issue. The record as it now stands shows clearly that the consideration for the stock was, in part at least, based on water service. True, the representation by appellants, to the effect that respondents could not get water unless they purchased stock, was fraudulent, but the fact remains that (taking the proffered evidence as true), respondents got something more from appellants than a mere certificate of stock. They received irrigation water at a reduced rate, considerably below the reasonable value of such water.

█ It is contended that the rule does not apply because the parties to the contracts are not the same. It appears that the water service contract is executed by an additional party, Hugo Upphoff, whose name was not upon the stock contracts. It also appears that this party was the husband of one of the plaintiffs, Vera E. Upphoff. It further appears from the findings that the land to be irrigated was owned by *plaintiffs alone,* and it would follow that the record shows that Hugo Upphoff had no interest whatever in the lands to be irrigated under said contract. It is obvious that the name of the husband upon the water contract was entirely superfluous. Appellants became bound to furnish water to landowners only upon lands described in the pleadings and findings, and the operation of the rule should not, and cannot, be suspended by such a highly technical contention. The contracts substantially comply with the requirement of the code section (1642, Civ. Code), *to the effect that the several* contracts must be between the same parties. No authorities are cited by respondents to uphold their contention.

It is unnecessary to discuss other objections made by respondents to the application of the rule. None of them meets the obvious conclusion to be reached from the record, to the effect that all of the contracts in reality constituted but one transaction. It is the first and primary duty of the courts to see that substantial justice is done. To permit only that part of a transaction to be shown which enhances the dam-

ages, and to refuse to admit in evidence another part of the same transaction which (on its face) would materially reduce such damages, would certainly not promote the ends of justice. We do not wish to be understood as holding that the proffered evidence is incontrovertible, but we do hold that it was the duty of the trial court to hear and consider the proffered evidence, and that the ruling of the court was prejudicial to such an extent as to require the issue of damages to be retried.

A matter which will arise on a further hearing concerns the finding to the effect that plaintiffs received nothing whatever of value because of the making of the stock purchase contracts, and that all payments upon the same were made without any consideration whatever. *If upon a retrial of the issue of damages the trial court should conclude that irrigation water was delivered to plaintiffs at a rate below the reasonable value thereof,* the court is directed to amend the finding mentioned above, by setting forth that there was something of value received by plaintiffs, and that there was a consideration for such contracts. This amendment in no manner affects the cause of action, and would only be made with a view to conform to our ruling on the matter of the several contracts being in fact but one transaction. The findings should also be amended to set forth the water contract, and the conclusions of law should be amended to show that all the contracts came within the provisions of section 1642 of the Civil Code. If other amendments to the findings and conclusions of law appear to the trial court to be necessary in order to conform to this opinion, they are directed to be made.

■ Taking up the appeal by plaintiffs, it is contended that the trial court erred in the manner of allowing interest. Under the judgment, interest at the legal rate was allowed upon the principal amount paid under the stock purchase contracts. It is contended that the court should also have allowed interest upon the interest paid under said contracts, from the date of payment of each instalment of interest. We believe the contention is correct. There is no logical distinction to be drawn between interest due on principal payments and interest payments made on such principal. Both amounts are damages which are equally certain of ascertainment, and interest should be allowed on each under the provisions of section 3287 of the Civil Code. This error

can be corrected under further proceedings, as it relates to the issue of damages only.

Numerous other contentions are advanced by appellants, but we find them to be without substantial merit. The findings cover all the material issues, and have ample support in the evidence, with the exception of those relating to damages.

It is therefore ordered that the judgment be, and it is, hereby reversed, and that the cause be remanded for retrial, upon the sole issue of the amount of damages due in accordance with the views herein expressed. Each party to pay his own costs on appeal.

A petition for a rehearing was denied by the District Court of Appeal on July 8, 1939, and the court in denying said petition modified its former opinion to read as above and rendered the following supplemental opinion:

THE COURT.—Petitions for rehearing have been filed by plaintiffs and defendants, both parties having appealed.

Appellants (plaintiffs) state that some of the language used in our opinion might be construed as holding that, as a matter of law, plaintiffs received water under and below its reasonable value, as part consideration for the stock contracts. We do not want to be understood as so deciding. That matter was and is strictly one of fact, to be determined by the trial court. These appellants also contend that what we had to say upon the measure of damages (to be applied in the event a retrial is had upon that issue), is no longer the law, section 3343 of the Civil Code having been amended during the course of the trial. It is contended that said action is applicable to the case. We have concluded that the discussion mentioned was not necessary to the decision. It is therefore ordered that the following portion of the decision be, and the same is stricken out:

Commencing with the words, ''The measure of damages is necessarily involved upon a retrial of the issue of damages'', at the bottom of page 34, and ending with the words, ''Defendants should not have been denied the right to make such proof'', at the bottom of page 35; also the word ''another'', (being the first word of the last paragraph on page 35), is stricken out, and the article ''A'' substituted in lieu thereof.

Plaintiffs contend that the court should order each party to the appeal to pay his own costs. We believe that the point is well taken. While the action was reversed, it was upon the limited issue of damages. Plaintiffs prevailed in respect to establishing a cause of action. It would therefore seem fair to order each party to pay his own costs. The opinion is therefore modified to the extent that the last sentence thereof, —"Defendants (appellants) to recover costs on appeal", is stricken out, and in lieu thereof the following substituted,— "Each party to pay his own costs on appeal".

Turning to the petition filed by defendant, we find nothing therein which, in our opinion, justifies any relief to it on rehearing. The railroad commission had no jurisdiction to hear and determine the issue involved here, and any attempt on the part of the commission to thus act, would be void. As we held in our opinion, there was evidence to sustain the finding that the Canal Company was not a *bona fide* mutual water company, but the mere creature of the Power Company,—a public utility. In effect (and in law) plaintiffs were dealing with the Power Company. The following provision of the *Public Utility Act, section 73, subdivision (a),* clearly confirms the view that plaintiffs pursued their remedy in the proper forum: "An action to recover for such loss, damage, or injury may be brought in any *court* of competent jurisdiction by any corporation or person".

No proceeding taken by the commission to compensate plaintiffs by concessions in water rates would deprive them of their right of action based on a tort. If plaintiffs took advantage of any such concession and any special rates, the proper course would be for the trial court to credit the difference between the amount of such special rates and the regular rates against the amount paid for the stock. If, on the acceptance of any preferential rate based upon these facts, the defendants waived their rights, (as plaintiffs state), the matter is of no consequence. This is a matter for the trial court on a retrial of the issue of damages.

The question of whether or not plaintiffs knew that the representations were false when the stock was purchased was one of fact for the trial court. The evidence is conflicting on this issue—plaintiffs testified that they had no such knowledge—and such finding is final in this court.

The other points raised have to do with the measure of damages. As we have stricken from the opinion what we had

to say upon that subject, the question is eliminated, and it is now a matter for the trial court, in the event of a retrial of the matter of damages.

It is ordered that the opinion be modified as specified above, and that the petitions for rehearing be denied.

A second petition for a rehearing of this cause was denied by the District Court of Appeal on August 7, 1939, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 5, 1939.