[Civ. No. 33112.   Second Dist., Div. One.   Aug. 28, 1969.]

DOROTHY S. McDANIEL, Plaintiff and Respondent, v. GLEN S. McDANIEL, Defendant and Appellant.

928

Grant B. Cooper, Kaplan, Livingston, Goodwin, Berkowitz & Selvin and Herman F. Selvin for Defendant and Appellant.

Frank B. Belcher and Ward & Hyler for Plaintiff and Respondent.

WOOD, P. J.—This is an action for damages for alleged misrepresentations by defendant husband to plaintiff wife in connection with a property settlement agreement in an action for divorce. In a nonjury trial, judgment was in favor of plaintiff for $351,244.38 general damages, $100,000 exemplary damages, and $100,000 as attorneys' fees. (The settlement agreement provided for attorneys' fees in actions to enforce rights thereunder or actions for any purpose arising from the marriage relationship.) Defendant appeals from the judgment.

Appellant contends that the evidence does not support the findings, and that the damages are excessive.

Plaintiff and defendant were married on March 4, 1942. They resided in New York until October 1, 1957, when they became residents of California. On March 16, 1965, a final judgment of divorce was entered awarding plaintiff a divorce on the ground of cruelty. While said divorce action was pending, the parties entered into a property settlement agreement.

During the marriage, and at the time of the settlement agreement, defendant was a stockholder, director, general counsel, and a senior vice president of Litton Industries, Inc., a corporation. Also during the marriage, plaintiff and defendant acquired community property, quasi-community property (Civ. Code, § 140.5) and separate property. While they resided in New York, defendant acquired two options to purchase stock in Litton Industries, Inc., and he acquired another such option while they resided in California. Through the exercise of those options, and through stock splits and stock dividends, he acquired about 66,000 shares of common stock of Litton. During the marriage, he had full management and control over the community property and the quasi-community property.

In connection with the property settlement negotiations, defendant, on December 18, 1963, submitted to plaintiff's counsel a financial statement which summarized defendant's assets and liabilities as of December 11, 1963. The statement, which was prepared by defendant for use in the settlement negotiations, sets forth all of the assets of the parties (total value of assets—$5,218,522), including 55,173 shares[1] of com-

---

[1]The statement refers to 55,175 shares. The judge found that defendant "actually" held 55,173 shares as of December 11, 1963. During the

mon stock of Litton, valued at $80 per share, and total liabilities of $577,757.

On January 14, 1964 (while the settlement negotiations were pending), Litton announced an offer to its shareholders whereby they could convert or exchange, on a one-to-one basis, a percentage[2] of their shares of common stock for preferred stock of Litton. Said conversion right was not divisible and was not subject to sale, exchange, gift or loan separate and apart from a share of common stock.

Between January 22, 1964, and January 30, 1964, defendant presented to Litton's transfer agent the 55,173 shares of common stock in exchange for preferred stock. On January 26, 1964, Mr. Britten, who did not desire to exchange common stock owned by his family for preferred stock, loaned 69,143 shares[3] of common stock to defendant, and on January 30, 1964, defendant presented said shares of common stock to the transfer agent in exchange for preferred stock. Thus, defendant presented 124,316 shares of common stock; and, on February 4, 1964, he received 7,070 shares of preferred stock (which was the number of shares obtainable at the conversion ratio of 5.687 percent). Defendant testified that after he had exercised the conversion rights under the "borrowed shares," he returned the "borrowed" share certificates to the Brittens; and he returned the "same" certificates "in toto in the same form without removing any portion" of the certificates.

During the negotiations for the property settlement agreement, a difference of opinion existed between the parties and between their counsel as to the amount, nature and extent of the community property, the quasi-community property, and the separate property of the parties, and as to the constitutionality of statutes regarding quasi-community property (Civ. Code, §§ 140.5 et seq.). Plaintiff and her counsel contended that the statutes were constitutional and that a substantial portion of the stock which had been acquired when they resided in New York was quasi-community property. Defendant and his counsel contended that the statutes were

---

marriage, defendant acquired 66,000 shares of common stock of Litton. He disposed of some of the shares by sale and by gift, and he had 55,173 shares as of December 11, 1963.

[2]The proposed conversion ratio was 5.687 percent. The actual ratio applied was 5.68 percent.

[3]In defendant's verified answer to the amended complaint herein, it is alleged that said 69,143 shares were transferred to defendant "by gift" and that "For this purpose, the said shares were loaned to defendant." The judge found that the 69,143 shares were a loan and were not a gift.

unconstitutional, and that a substantial portion of said stock was defendant's separate property.

On February 14, 1964, defendant and his attorney (Mr. Grant Cooper) had a conference with plaintiff's attorneys (Mr. Guy Ward and Mr. Frank Belcher) regarding the proposed settlement agreement. Plaintiff and her counsel were aware of the announced offer by Litton for the exchange of stock, but they were not aware that defendant had acquired 7,070 shares of preferred stock by presenting the stock allocated in the agreement to him as his separate property, the disclosed community-property stock, and the stock which he borrowed from the Brittens. The conferees examined and discussed the financial statement of December 11, 1963, wherein it was stated that defendant had 55,173 shares of common stock in Litton, and they agreed that 42,750 shares thereof would be treated as community property and that the remaining 12,423 shares would be treated as defendant's separate property, and that one-half (21,375) of the community property shares would be allocated to plaintiff. They also agreed that under the proposed conversion ratio (5.64 percent)[4] for the exchange of Litton stock, plaintiff would receive, from the 21,375 shares allocated to her, 20,170 shares of common stock, and 1,205 shares of preferred stock. It was further agreed that defendant's counsel (Mr. Cooper) would prepare a draft of a property settlement agreement.

At the conference on February 14, neither the defendant nor his attorney said anything regarding the stock which defendant had obtained from the Brittens and had used in the exchange for preferred stock. Mr. Ward (plaintiff's counsel) testified that during the course of the conference, he asked whether there had been any change in the assets in the December 11 financial statement; defendant replied that there had been "no change of any substance"; he (Mr. Ward) also asked defendant whether defendant "had intended and was converting the maximum" amount of shares; and defendant replied in the affirmative. Defendant testified that nothing was said at the conference regarding a change in defendant's assets or a change in the December 11 statement; and that he was not asked whether he intended to convert the maximum

---

[4] If the parties had allocated preferred shares to plaintiff on the basis of the actual conversion ratio (5.687 percent), she would have received 11 more preferred shares. In his brief, appellant states that he subsequently offered her 11 additional shares of preferred stock if she would surrender 11 shares of common stock, and that she did not accept the offer.

amount of shares. Defendant also testified that after the conference ended, he told Mr. Cooper (his attorney) about the preferred shares which he had acquired by using the Britten stock, and that Mr. Cooper advised him that he was under no obligation to disclose that fact because the stock came to him as a gift and by the use of his separate property, and because the settlement had been made on the dollar basis, based upon the financial condition shown by the December statement.

Thereafter, defendant's counsel prepared and sent to plaintiff's counsel a proposed draft of the agreement which, among other things, allocated the shares of Litton stock in the manner agreed upon at the conference. Defendant's counsel also telephoned plaintiff's counsel and suggested that the agreement have an effective date of January 1, 1964, for tax purposes so that the parties could make their tax returns on a calendar year basis. Subsequently (February 26, 1964) counsel for plaintiff and counsel for defendant held a meeting where defendant's counsel again requested that the agreement be effective as of January 1, 1964, for tax purposes; and counsel for plaintiff agreed to such effective date. A few minor changes were made in the prepared agreement (none of which related to the amount or the allocation of the Litton stock), and on March 3, 1964, the parties signed the agreement.

The agreement provides that it was "entered into and effective January 1, 1964." It also provides, among other things, that the parties represent one to the other that there has been a full, fair and complete disclosure of the assets and liabilities of each of them. Attached to, and incorporated in, the agreement are several schedules setting forth the assets and liabilities of the parties. (The schedules in substance include the assets and liabilities in the financial statement of December 11, 1963.) The agreement provides that the community property possessed by the parties as of the effective date of the agreement is as set forth in Schedule A, which is attached to and incorporated in the agreement. That schedule provides that 42,750 shares of Litton common stock are community property. (Schedule C, which sets forth defendant's separate property, includes 12,423 shares of the stock.) The agreement also provides that the community property shall be divided equally between the parties and that if at any time after the execution of the agreement any community property be discovered that is not set forth in the schedules, or otherwise listed or recognized, any such property shall promptly be divided equally at its then reasonable market value. The

agreement further provides in substance that if either party should institute legal proceedings for the purpose of enforcing any rights or obligations under the agreement, or for any interpretation of any of its provisions, or for any other purpose arising out of or in connection with the marriage relationship, the unsuccessful party shall pay reasonable attorney's fees to the prevailing party.

With reference to Mr. Cooper's request that the agreement be made effective as of January 1, 1964, it was conceded that a reason he gave for the request was that the parties would be enabled to file tax returns on a calendar year basis. Mr. Cooper testified, however, that he gave Mr. Ward an additional reason for the request that the agreement be effective as of January 1, 1964—which reason was that the discussions with reference to the agreement had been predicated upon the financial statement of December 11, 1963. Mr. Ward testified that the only reason which Mr. Cooper gave for the request was that regarding the tax returns.

After the agreement was executed, defendant sent 1,305 shares of Litton preferred stock to plaintiff. (He erroneously sent 100 more of the shares than the 1,205 shares which she was to receive under the agreement.)

After defendant had exchanged the common stock for preferred stock, he reported the exchange to the Securities and Exchange Commission. Thereafter (about May 20, 1964), Mr. Ward discovered from a report of the commission that, as of March 9, 1964, defendant owned 5,755 shares of Litton preferred stock. On July 31, 1964, Mr. Ward sent a letter to Mr. Cooper wherein he stated the information which he had discovered in the report, and he asked Mr. Cooper for an explanation of the discrepancy between the 5,755 preferred shares which the commission reported that defendant held and the lesser number of preferred shares which purportedly were available to defendant by conversion of common stock when they discussed such conversion at the settlement conference on February 14, 1964. In reply thereto, Mr. Cooper sent a letter to Mr. Ward wherein he stated that defendant informed him that the additional preferred stock "represents a business transaction entered into by him [defendant] after the date of the Property Settlement Agreement." Mr. Cooper also stated (in the letter) that "The representations respecting the community property of the parties set forth in Paragraph II [of agreement] are accurate and true."

Defendant continued to hold 5,755 preferred shares until March 10, 1966, at which time he exchanged those shares, on a one-for-two basis, for 11,530 shares[5] of Litton convertible preference stock. On said date (March 10, 1966) Litton preferred stock was selling on the New York Stock Exchange for $152.50 a share, and Litton convertible preference stock was selling for $80.25 a share. From March 3, 1964 (date agreement executed), until March 10, 1966, defendant received dividends on the preferred stock of approximately $59 a share.

The present action was commenced on April 27, 1965. The amended complaint alleges a cause of action for damages for misrepresentations and a cause of action for declaratory relief. The first cause of action includes, in addition to allegations as to damages for misrepresentations, allegations to the effect that defendant breached the fiduciary duty he owed to plaintiff by reason of his full management and control over the community property of the parties; allegations with reference to exemplary damages; and allegations with reference to the provisions of the property settlement agreement relating to attorneys' fees in legal proceedings.

Some of the findings are in substance as follows: During the marriage, plaintiff and defendant accumulated community property and separate property having the status of quasi-community property under section 140.5 of the Civil Code, and each party accumulated separate property. Defendant had full management and control of the community property, the quasi-community property, and his separate property. No issue exists as to the truthfulness of the financial statement which summarized defendant's assets as of December 11, 1963. Said statement showed that defendant held 55,175 shares of Litton common stock. Actually, defendant then owned 55,173 shares of such stock. Said summary of assets was intended and represented by defendant to be a full, true, and complete statement of his assets and liabilities, including all property, whether community, quasi-community, or separate, held by defendant. Prior to the execution of the property settlement agreement on March 3, 1964, there existed an honest difference of opinion between the parties and between their counsel as to the amount, nature, and extent of the community, quasi-community, and separate property of the

---

[5]There is an apparent discrepancy in the record regarding the number of shares (5,755) which defendant held according to the report of the commission, and the number of shares (5,765) which he exchanged for the 11,530 shares of convertible preference stock.

parties and as to the constitutionality of sections 140.5 et seq. of the Civil Code. On or about January 22, 1964, defendant presented to Litton's transfer agent certain shares of Litton common stock for exchange for Litton preferred stock. On or about January 26, 1964, the Britten family loaned 69,143 shares of Litton common stock to defendant; and defendant presented that stock to the transfer agent on or about January 30, 1964. Defendant presented a total of 124,316 shares of common stock to the transfer agent, said total being 12,423 shares which were subsequently allocated to defendant as his separate property, 42,750 shares which were community property, and 69,143 shares owned by the Britten family and loaned to defendant. The use of the common stock of the Britten family was not the subject of a gift, and such stock was not loaned to defendant upon his separate credit. Prior to the preparation of the settlement agreement, a conference was held by defendant, Mr. Cooper, Mr. Ward, and Mr. Belcher on February 14, 1964. It was tentatively agreed at the conference, by way of compromise, that of the 55,173 shares of common stock held by defendant, 42,750 shares would be treated as community property and would be divided equally between the parties, and 12,423 shares would be treated as defendant's separate property. At the conference, the offer of Litton to exchange common shares for preferred shares was discussed, and, based upon an announced conversion ratio of 5.64 percent, it was agreed that the 21,375 shares of common stock allocated to plaintiff as one-half of the community property would give plaintiff 1,205 shares of preferred stock and 20,170 shares of common stock. By reason of his management, possession, and control of the community property and quasi-community property of the parties at all times up to and including the excution of the property settlement agreement on March 3, 1964, defendant occupied the position of a fiduciary as to plaintiff, and as such fiduciary, he had the duty to make a full disclosure to plaintiff or her counsel of all property owned, held, or possessed by him, whether community, quasi-community, or separate in character. At the conference of February 14, 1964, hereinabove referred to, defendant represented to counsel for plaintiff that there had been no material change in his summary of assets of December 11, 1963, and that the exchange of Litton common stock for preferred stock was an event which would take place in the future. Said representations were false and fraudulent in that at said time defendant held and possessed 7,070 shares of

preferred stock of Litton which were not set forth in said summary of assets or in any other manner disclosed to plaintiff. In truth and in fact, defendant had received certificates issued in his name evidencing said 7,070 shares of preferred stock on February 4, 1964, and defendant continued to hold said certificates up to and including the execution of the settlement agreement on March 3, 1964. Plaintiff's counsel knew that defendant could obtain 3,132 shares of preferred stock ''as his pro-rata'' for 55,173 shares of common stock held by him, but neither plaintiff nor her counsel knew, prior to the execution of the settlement agreement that defendant held an additional 3,932 shares of preferred stock since February 4, 1964. At no time during the conference of February 14, 1964, did defendant or his counsel disclose his ownership of Litton stock other than as set forth in the financial statement of December 11, 1963. By reason of defendant's position as a fiduciary as to plaintiff, it was his duty during the settlement negotiations at said conference, and prior to the preparation and execution of the property settlement agreement, to disclose that he held 7,070 shares of preferred stock. No disclosure of said fact was made and defendant concealed said fact from plaintiff and her counsel, and he continued to conceal said fact until discovery thereof by plaintiff's counsel about May 20, 1964. In the latter part of February 1964, defendant's counsel prepared and submitted to plaintiff's counsel a draft of the property settlement agreement, and schedules of property attached thereto, which provided that 42,750 shares of Litton common stock were community property, and 12,423 shares of such stock were defendant's separate property, and that as to plaintiff's one-half (21,375 shares) of the stock, defendant shall exercise the right to exchange at least 1,205 shares for preferred shares and shall deliver to plaintiff 1,205 preferred shares and 20,170 common shares. A few minor changes were made in the draft, and the parties executed it on March 3, 1964. Said agreement provides in part that the parties represent one to the other that there has been a full, fair, and complete disclosure of the assets and liabilities of each of them. Said representation by defendant was false, and was known by defendant to be false, in that from February 4, 1964, to March 3, 1964, defendant failed to disclose, and concealed, the fact that he held 7,070 shares of preferred stock. By letter dated July 31, 1964, Mr. Ward advised Mr. Cooper that information had been received that defendant actually owned 5,755 shares of preferred stock

as of March 9, 1964, and Mr. Ward requested an explanation thereof. By letter dated August 24, 1964, Mr. Cooper advised Mr. Ward that the additional shares of stock represented a business transaction entered into by defendant after the date of the settlement agreement, and that the representations respecting community property set forth in the agreement were accurate and true. The representation in said letter with reference to the additional stock was untrue, and was made by defendant with knowledge that it was false and with the design of further covering up and concealing defendant's prior fraud. (Here, there are detailed findings with reference to the manner in which defendant obtained the additional 3,932 preferred shares by borrowing the 69,143 common shares from the Brittens.) The transaction involving the Britten family stock constituted a loan by the Brittens and a borrowing by defendant. Such transaction was not a gift to defendant. The 3,932 shares of preferred stock acquired by defendant by use of the Britten stock was community property, and as such, plaintiff was entitled to one-half thereof, or 1,966 shares. The property settlement agreement provides in part that if at any time after the execution of the agreement any community property be discovered that is not set forth in the schedules, or otherwise listed or recognized, any such property shall be promptly divided equally at its then reasonable value. By reason of said provision, plaintiff is entitled to recover from defendant the reasonable value of 1,966 shares of preferred stock as such value existed at the time of conversion thereof by defendant on March 10, 1966, together with dividends of $11,550.25 received thereon, and interest thereon from March 10, 1966. At all times during the pendency of the divorce action until the execution of the settlement agreement on March 3, 1964, plaintiff believed defendant's representations and believed that defendant would and had performed his fiduciary duties to her and that he had disclosed all of the stock which he owned or held in Litton; and, in reliance upon such belief, she executed the property settlement agreement. Under said agreement the community property was agreed to be equally divided between the parties. By reason thereof plaintiff was entitled to receive 1,966 shares of preferred stock, or the reasonable value thereof, at the time of its conversion, together with the proceeds resulting therefrom. Demand has been made upon defendant, but he has refused to deliver said shares or the proceeds thereof to plaintiff. By reason of defendant's failure

to disclose, and his concealment of, said 3,932 shares of preferred stock, and by reason of his fraudulent representations in regard thereto and his retention of the preferred shares, defendant became an involuntary and constructive trustee for the benefit of plaintiff of one-half of such shares, or 1,966 shares. Defendant continued to hold said 1,966 shares as constructive trustee until March 10, 1966, at which time he exchanged them for 3,932 shares of convertible preference stock of Litton. On that date the reasonable value of the preferred stock was $152.50 a share, and the reasonable value of the convertible preference stock was $80.25 a share. The reasonable value of the proceeds received by defendant from such exchange was $315,543. From March 3, 1964, to March 10, 1966, defendant received dividends of $11,550.25 on the 1,966 shares of preferred stock, which dividends were additional proceeds received and retained by defendant. Defendant's failure to disclose and his fraudulent representations herein were done knowingly, wilfully, by design, and with intent to defraud plaintiff. By reason thereof, plaintiff is entitled to recover exemplary damages of $100,000. By reason of the provision of the property settlement agreement regarding attorneys' fees for the successful party in an action to enforce provisions thereof or for any purpose arising from or in connection with the marriage relationship, plaintiff is entitled to recover reasonable attorneys' fees from defendant. The reasonable attorneys' fees for plaintiff herein are $100,000. The property settlement agreement was executed on March 3, 1964, and provided that it was ". . . effective January 1, 1964 . . . ." (Here there are detailed findings with reference to the manner in which Mr. Cooper requested that Mr. Ward agree to have the agreement made effective as of January 1, 1964.) The inclusion in the agreement of the quoted phrase (effective January 1, 1964) was not for the sole purpose of convenience in tax matters so that the parties could file tax returns on a calendar year basis, but was for the additional undisclosed purpose of permitting defendant to claim that the additional 3,932 shares of preferred stock were his sole and separate property because they were obtained after January 1, 1964. The conduct of defendant with respect to including said phrase in the agreement was for the purpose of permitting defendant to cover up, conceal, and justify the prior fraud of defendant with reference to said 3,932 shares of preferred stock. (There are further findings to the effect that there was an actual controversy between the parties regarding their

rights, etc., with reference to the 7,070 shares of preferred stock.)

■ Appellant contends that the evidence does not support the findings. He argues that the additional shares of Litton preferred stock were obtained by him as a gift from the Brittens; that such additional shares of preferred stock were his separate property, or "at best" said shares were quasi-community property; and that he had no duty to disclose such additional shares of stock.

As previously stated, the court found that the Britten stock was loaned to the defendant; that it was not a gift; and that it was not loaned to defendant upon his separate credit. The evidence was sufficient to support those findings. Defendant's testimony was to the effect that he borrowed the Britten stock and returned it "in toto" after he obtained the additional preferred stock. Those transactions occurred prior to the date of the settlement conference (February 14, 1964) and prior to the date the settlement agreement was signed by the parties (March 3, 1964). The court could reasonably find that the Britten stock was not loaned upon defendant's separate credit. The Britten stock used by defendant consisted of 69,143 shares which was more, of course, than the 55,173 shares held and controlled by defendant. The loan of the Britten stock was made in California while defendant held and controlled the community property of the marriage. The court could reasonably find that the additional shares acquired through the loan of the Britten stock were community property.

Appellant's assertion that the additional shares so acquired were his separate property is without merit. It was stipulated that if defendant's accountant, who had examined his books and records, were called as a witness by defendant, he would testify that the additional preferred shares acquired through the loan of the Britten stock were either community property or quasi-community property. Appellant states that "at best" they were quasi-community property. Upon the record herein, it cannot be said that there was sufficient evidence of tracing the acquisition of the additional shares to his separate property in New York so as to establish that the additional preferred shares were acquired by reason of the use of his separate property.

■ It is conceded that if the additional preferred shares were community property, then defendant had a duty to disclose his holding of such shares during the settlement negotia-

tions in the divorce proceedings. (See *Vai* v. *Bank of America*, 56 Cal.2d 329 [15 Cal.Rptr. 71, 364 P.2d 247].) If it were assumed that the additional shares of preferred stock were "at best" quasi-community property, defendant had a duty to disclose the existence of such shares under the circumstances herein. The evidence shows (and the court found) that the financial statement of December 11, 1963, was intended as a full disclosure of all of the assets, separate, quasi-community, and community; and that it was intended that all the assets of the parties, whether separate, quasi-community, or community assets, should be set forth in the schedules attached to the agreement. The parties expressly represented in the agreement that there had been "a full, fair and complete disclosure of the assets and liabilities of each of them." Furthermore, as of the date of the settlement conference, there had been a dispute between the parties as to the nature and extent of the community property, quasi-community property, and separate property, and there was a dispute as to the constitutionality of the statutes regarding quasi-community property (Civ. Code, §§ 140.5 et seq.)[6] and, in order to compromise and settle the disputes, they agreed, at the conference, to allocate[7] the 53,173 shares of Litton common stock

---

[6]In *Addison* v. *Addison*, 62 Cal.2d 558 [43 Cal.Rptr. 97, 399 P.2d 897, 14 A.L.R.3d 391], where it was contended that the legislation as to quasi-community property was unconstitutional, the contention was not sustained.

In recommending the legislation, the California Law Revision Commission stated, among other things: "There is no reason why California should treat quasi-community property differently from community property on divorce or separate maintenance; the relationship of the spouses to quasi-community is far more analogous to their relationship to community property than to separate property. To take an example, suppose that a man and woman are married in New York and live there for 20 years, that they then move to California and live for a second 20 years and that at the end of the period they have $100,000 worth of property which was accumulated out of the husband's earnings over the 40 years involved. The wife's contribution to the accumulation of the $100,000 would in all probability have been no different during the second 20-year period than it was during the first." (3 Cal. Law Revision Com. Reports, p. I-7.)

[7]Section 140.5 of the Civil Code provides in part that "quasi-community property" means all personal property wherever situated heretofore or hereafter acquired by either spouse while domiciled elsewhere. Section 146 of the Civil Code provides in substance that upon divorce or separate maintenance the court shall make an order for disposition of the community property and the quasi-community property. In the present case, the parties had commenced divorce proceedings and then sought to compromise their dispute over the nature and extent of the community property, quasi-community property, and separate property, and their dispute as to the constitutionality of the quasi-community property statutes; and they compromised said disputes by the agreed allocation of the stock which had been disclosed. It is reasonable to assume that

(i.e., those shares which defendant had disclosed) and to treat 42,750 shares as community property, and 12,423 shares as defendant's separate property; and it was further agreed (at conference) that plaintiff would receive the pro rata portion of the preferred shares which could be obtained in a proposed exchange utilizing the *disclosed* number of common shares. Not only did defendant, at the conference, conceal the fact that he had already obtained additional preferred shares through the loan of the Britten stock, but he represented that the obtaining of the preferred shares was an event which would occur thereafter (it had already occurred), and he represented that there had been no material change in his summary of assets in the December financial statement. The evidence supports the findings that those representations and concealments were false. The evidence also supports the findings that defendant's representation in the agreement that there had been a full, fair, and complete disclosure of his assets and liabilities was false; the findings that defendant fraudulently induced plaintiff's counsel to make the agreement effective as of January 1, 1964, in order to cover up and conceal the prior fraud; the finding that defendant, by the letter of his counsel on August 24, 1964, fraudulently sought to further cover up and conceal the prior fraud after plaintiff had discovered that defendant had acquired the additional preferred shares; and the findings that defendant, by reason of fraudulent concealments and representations, and by reason of the retention of the additional preferred shares, became an involuntary and constructive trustee for the benefit of plaintiff of one-half of the additional shares.

Appellant further contends that the damages were excessive. Among other things, he argues in effect that the damages were awarded either under the after-acquired community property clause of the settlement agreement, or for fraud, or for breach of fiduciary duty, or for unjust enrichment; that an award under the after-acquired community property clause would be unwarranted because the additional preferred shares were not community property; that an award of damages for fraud should have been limited to plaintiff's out-of-pocket damages; that the award exceeded the amount allowable for the unjust enrichment or profit of the "asserted fiduciary" (defendant); and that if the damages were

the parties agreed to allocate said stock in lieu of having the court exercise its power, under section 146 of the Civil Code, to order disposition of the community property and quasi-community property.

awarded under the aforementioned clause of the agreement, then exemplary damages should not have been awarded.

Section 2224 of the Civil Code provides that one who gains a thing by fraud, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it. (See 4 Witkin, Summary of Cal. Law, Trusts, § 88, p. 2970; *Heinrich* v. *Heinrich*, 2 Cal.App. 479, 483 [84 P. 326].) A constructive trust will also arise from violation of a fiduciary duty. (*Ibid.*)

In the present case, there was evidence (and findings) to the effect that defendant gained the additional shares of preferred stock by fraud and by breach of fiduciary duty, and that he thereafter fraudulently concealed and covered up his original fraud; and that he retained the shares and about two years thereafter (on March 10, 1966) he exchanged them (3,932 shares of preferred) for convertible preference stock (on the basis of one share of preferred for two shares of convertible preference—making a total of 7,864 shares). At that time convertible preference stock had a market value of $80.25 per share—making a total value of approximately $631,086. As previously stated, the court found that defendant, by reason of his misrepresentations and concealments, was an involuntary or constructive trustee of one-half (1,966) of said preferred shares for the benefit of plaintiff; that the reasonable value of the proceeds received by defendant from the exchange of 1,966 shares (one-half of 3,932 shares) of preferred stock for 3,952 shares of convertible preference stock was $315,543; that defendant had received dividends of $11,550.25 thereon; and that plaintiff was entitled to said proceeds and dividends, and interest thereon from March 10, 1966 (total amount—$351,244.88). Said amount was ascertainable under the evidence presented.

The present action is for damages for fraud in failing to disclose at the time of making the contract, the existence of additional shares of preferred stock. Under the contract as made (without defendant's disclosing the additional stock) the plaintiff received certain common stock. In the matter of determining the amount of damages for the fraud in failing to make such disclosure, the defendant seems to argue that since he delivered some common stock in exchange for the additional preferred stock, the plaintiff should be required to account, from her common stock, for her pro rata part of the

common stock which he used in acquiring the undisclosed preferred stock. Stated in another way, the defendant seems to argue that, in determining the amount of damages for the fraud in not disclosing the preferred stock, he should be credited with one-half of the value of the common stock which he exchanged in acquiring the preferred stock. A part of his argument now, as to the method of determining damages, after the concealment of the preferred stock has been discovered, is to the effect that the determination should be upon a mathematical computation as to what amount of the common stock allotted to plaintiff under the agreement should be appropriated as her contribution toward the expense of acquiring the undisclosed stock. He obtained the preferred shares before the settlement agreement was made, and while he was concealing the existence of that stock, he executed the agreement whereby plaintiff received a stated amount of common stock. That contract is, of course, still in effect. Defendant is not in a position to assert that plaintiff was not entitled to the common stock alloted to her by the agreement. By his failure to disclose, prior to making the agreement, the existence of the preferred stock, he deprived plaintiff of the opportunity to negotiate or consider a compromise division of all of the stock which in fact was owned by the parties.

In *Boyd* v. *Bevilacqua,* 247 Cal.App.2d 272 [55 Cal.Rptr. 610], where there was an oral joint venture for the purpose of purchasing and developing land, some of the members of the venture fraudulently appropriated land to the exclusion of the plaintiffs; and the defendants (appellants) contended, among other things, that the court erred in instructing the jury on the computation of damages. In that case it was said (p. 294): "Defendants argue that the proper measure of damages is the fair market value of the property *less the cost of acquisition* and that the omission of the last factor from the instruction constitutes reversible error." That contention was not upheld. It was said further therein (p. 294): "The present action sounds in tort, not in contract. Here plaintiffs elected to affirm the joint venture agreement, to consider it as terminated and repudiated by defendants and to seek damages for their fraud. . . . As to cases like the instant one involving fraud of fiduciaries the much broader provisions of sections 3333 and 1709 of the Civil Code are applicable rather than the 'out of pocket' rule codified in section 3343 covering the vendor-vendee relationship. . . . In connection with the instruction under consideration, the trial judge instructed the

jury substantially in accordance with section 3333. As we have explained, plaintiffs' theory of case was that defendants conspired to defraud them by acquiring for themselves exclusively the commercial and multi-dwelling acreages which was to have been the property of the joint venture. By its instructions therefore the court told the jury in effect that if they found in favor of plaintiffs, the latter were entitled to have the fair market value of that which was taken from them, namely their one-third interest in the joint venture property. We find no error in the giving of the instruction.''

Civil Code section 3333 provides: ''For the breach of an obligation not arising from contract, the measure of damages, . . . is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.''

Civil Code section 1709 provides: ''One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.''

A trustee may not use or deal with the trust property for his own profit (Civ. Code, § 2229), and a trustee who uses or disposes of trust property may, at the option of the beneficiary, be required to account for all profits so made, and if he has disposed thereof, to replace it, with its fruits, or to account for its proceeds, with interest (Civ. Code, § 2237). The court did not err in awarding general damages. The record discloses no abuse of discretion in awarding exemplary damages. (See *Ward* v. *Taggart*, 51 Cal.2d 736, 743 [336 P.2d 534].)

The judgment is affirmed.

Fourt, J., concurred.

THOMPSON, J.—I agree with the opinion of the majority that the conclusions of the trial court with respect to appellant's liability are supported by the evidence, findings, and the law. I concur with the result reached by the majority with respect to the affirmance of the amount of damages awarded by the trial court solely because of the procedural limitations upon review dictated by the long-standing rule followed and described in *Wood* v. *Keller*, 72 Cal.App.2d 14 [163 P.2d 904].[1] There Justice McComb speaking for the Court of

---

[1]The damages awarded by the trial court seem to me to be unsupported by substantial evidence. The court found that a right to exchange common shares for preferred shares in Litton Industries acquired in the name

Appeal in affirming a judgment of a court sitting without a jury states (p. 17) : ". . . the law is established in California that the point that damages are excessive cannot be raised for the first time on appeal, but must be presented to the trial court on motion for a new trial before an appellate court will consider whether the damages are excessive or not." There was no motion for a new trial made in the case at bench. Appellant argues that his failure to move for a new trial by reason of excessive damages is excused because he raised the issue in his objections to findings of fact. He argues also that the rule stated in *Wood* v. *Keller, supra,* is limited to those situations in which the contention is made that the trial court awarded excessive damages because of passion or prejudice. Both contentions would have us ignore the broad sweep of the long-standing doctrine of appellate procedure. A change in that doctrine, if warranted, should come from a higher tribunal.

The cases cited by appellant to support his contentions do not do so. *Schmidt* v. *Macco Constr. Co.,* 119 Cal.App.2d 717 [260 P.2d 230] holds only that errors in the admission of evidence and in jury instructions may be raised on appeal without a motion for new trial although those errors contribute to an ultimate error in damages. *Roche* v. *Casissa,* 154 Cal.App.2d 785 [316 P.2d 776], states that the rule requiring a motion for new trial as a prerequisite to an appeal on an

---

of appellant husband was community property because it was acquired in the form of a "loan" of common shares, to which the right was attached, upon the credit of the community assets. It then held that knowledge of the existence of the right had been fraudulently concealed from respondent wife in negotiations for a property settlement. It computed damages not on the basis of the value of the right that had been concealed but on the basis of the gross value of the preferred stock obtainable in the exchange.

Such a computation does far more than compensate the injured party for all detriment proximately caused by the wrong. (Civ. Code, § 3333; *Goodspeed* v. *Great Western Power Co.,* 33 Cal.App.2d 245 [91 P.2d 623, 92 P.2d 410]; *Westerfeld* v. *New York Life Ins. Co.,* 129 Cal. 68 [58 P. 92, 61 P. 667]; *Taylor* v. *Hopper,* 207 Cal. 102 [276 P. 990].) Moreover, it ignores the finding on which the community character of the right is based. If in fact there was a loan in the form of common shares of Litton to which was attached the right to exchange those shares for preferred, credit must be taken at some point in the computation for repayment of the loan by the return of the common shares borrowed or their equivalent. The measure of damages adopted by the trial court allows no such credit. It is as if the court, having found that by reason of a loan of $300,000 on the community credit fraudulently concealed from his wife a husband had acquired a parcel of real property worth $330,000, had then computed damages for the concealment as half of the gross $330,000 value of the property ignoring the community obligation to repay the $300,000.

issue of damages is not applicable where the contention is that there is no evidence of any damage at all. Neither decision is apposite to the situation of the case at bench. The issue which appellant now seeks to raise deals with the manner of computation of damages. It does not deal with any error in the proceedings leading to the judgment nor does it encompass a claim that an element necessary to recovery, i.e., damages, was not proved.

A petition for a rehearing was denied September 25, 1969, and appellant's petition for a hearing by the Supreme Court was denied October 22, 1969.