[Civ. No. 12992. Third Dist. July 20, 1972.]

CARPENTER FOUNDATION, Plaintiff and Appellant, v.
RICHARD F. OAKES, Defendant and Appellant.

## COUNSEL

Kroloff, Belcher, Smart, Ford, Norris & Keitges, William B. Boone, and Choate, Hall & Stewart for Plaintiff and Appellant.

Boyken, Mohler, Foster & Schwab and Dirks B. Foster for Defendant and Appellant.

## OPINION

**RICHARDSON, P. J.**—The trial court entered a judgment enjoining defendant from publishing and distributing certain writings and ordering him to surrender written material to plaintiff but denying plaintiff's prayer for damages. Defendant appeals from the injunctive phase of the judgment, and plaintiff appeals from that portion denying damages.

After a nonjury trial the court made detailed findings of fact. We summarize the findings substantially as follows: The Carpenter family and defendant, all practicing Christian Scientists, became acquainted in 1937. Having been advised that the Carpenters were engaged in the collection of historical material pertaining to the origin of Christian Science, defendant called upon them. A close personal friendship developed between defendant and Gilbert Carpenter, Jr. Defendant, then a resident of Great Britain, frequently visited the Carpenter home in East Providence, Rhode Island, and in 1946 resided with the Carpenters for several months.

Additional visits occurred between 1948 and 1951, and defendant received occasional financial assistance from the Carpenters.

Plaintiff was formed as a Rhode Island nonprofit corporation in 1946, nine years after the Carpenters and defendant became acquainted, for the purpose of "preserving items by and about MARY BAKER EDDY, Discoverer and Founder of Christian Science . . .; and to make such items ever accessible to qualified students throughout the world." Its founder and first president was Gilbert Carpenter, Jr. A relationship of confidentiality and trust developed over the years and existed between defendant and the Carpenters and plaintiff as successor to the Carpenters. As a result of this relationship, defendant received from the Carpenters and from plaintiff substantial quantities of written and printed materials of varying kinds which the parties have referred to as the "Carpenter Papers" or the "Carpenter Materials," and which were specifically described in the judgment. The nature of the materials is varied. There is voluminous correspondence from and speeches by Mrs. Eddy, memoirs and recollections of students who knew Mrs. Eddy, essays on Christian Science, press clippings, photographs, diaries, notes, observations, pictures, poems, precepts, quarterlies, sermons, prayers and miscellaneous documents. They include both religious discussion and witness as well as personal reminiscence. Together they constitute a composite of writings and expressions, covering many years and are of unique significance in the historical development of Christian Science.

The source of the "Carpenter Materials" was Mary Baker Eddy, Mr. Calvin Frye (Mrs. Eddy's private secretary), Gilbert Carpenter, Sr. (a one-time secretary of Mrs. Eddy), Gilbert Carpenter, Jr., founder and president of plaintiff, other students of Mrs. Eddy's, including Caroline Foss Gyger, and other members of the Carpenter family.

The trial court found that the conditions accompanying the delivery of the Carpenter materials to defendant were that they would be given only a limited, private and restricted circulation to those students of Christian Science defined as "qualified," by which was meant those who had "sufficiently advanced" and were mature enough to understand, accept and profit by the study of the materials. By mutual agreement of the parties, defendant, then living in England, established in 1947 the London Unit of the Carpenter Foundation. The unit consisted of a collection of historical materials on Christian Science received by defendant from plaintiff to be made available to interested and qualified students of Christian Science, together with a reading room established in London for that purpose. Defendant thus became the agent of plaintiff, working on its behalf and to further its purposes in London, England, and elsewhere. The London

Unit was disbanded in 1948, but thereafter through 1953 defendant continued to receive various Carpenter materials, including among other documents the following titles: Collectanea Addenda, Divinity Course, Essays, Footprints Fadeless, Fragments, Instruction in Metaphysics, Notes of Metaphysical Work, Obstetrics, Repaid Pages, Visions and Watches, Prayers and Arguments and miscellaneous documents.

In 1950, and without the knowledge of plaintiff or its founder, Gilbert Carpenter, Sr., defendant established a book business in England under the name of "C.C.T. Books," and sold to the general public certain of the Carpenter materials. In 1955 defendant moved to South Africa. In 1958 he published a work entitled, "Divinity Course and General Collectanea," and in 1959 a second book entitled, "Essays and Other Footprints." These volumes were published in South Africa, had a fairly limited initial issue and circulation and were in very large part extracts from the Carpenter materials. The extent to which the Carpenter materials comprised the two volumes is carefully and impressively documented in the record. Although having a fairly limited initial issue and circulation, the volumes were published without restriction, contrary to plaintiff's policy of limiting access to "qualified" students.

Plaintiff insists that the Carpenter materials came into the possession of defendant by virtue of a relationship of agency, trust and confidence, and that receipt of the documents was under both the express and implied understanding and condition that documents would be circulated among only those "qualified" students of Christian Science. Defendant argues, among other things, that the publication of these two works is in accordance with an understanding with Mr. Carpenter, Jr., arising from a close personal friendship and commencing a considerable time before the formation of plaintiff corporation and, consistent with their agreement, that the materials would get the widest possible exposure.

The oral and documentary evidence before the trial court was voluminous. Most of it related to the origins of Christian Science, the written works of the founder of Christian Science, Mary Baker Eddy, and the various commentaries and observations by students and interpreters of Christian Science and of Mrs. Eddy. The oral testimony included that of officers of the plaintiff, of defendant and of various persons who were acquainted with the Carpenters and presumably knowledgeable about the relationship between the Carpenters and their successor, plaintiff foundation, on the one hand, and defendant, on the other. Extensive discovery was had and following trial the court announced its intended decision in which it granted and denied relief as above indicated. Thereafter detailed

findings of fact and conclusions of law were signed and filed by the court, and a judgment was entered consistent with the findings.

Defendant was ordered by the trial court permanently to refrain from further production or distribution of "Essays and Other Footprints" and "Divinity Course and General Collectanea," and to surrender to plaintiff all Carpenter materials in his possession.

Defendant makes four principal contentions in his appeal: first, that the judgment violated constitutional guaranties of freedom of dissemination of ideas contrary to the First Amendment; second, that the judgment granted plaintiff a perpetual monopoly of the Carpenter materials without benefit of copyright; third, that no trust or confidential agency or relationship was established between plaintiff or its predecessors, on the one hand, and defendant, on the other, with respect to the Carpenter materials; and fourth, that the judgment is unduly broad and all encompassing.

Plaintiff appeals from that portion of the judgment which denied to plaintiff any money damages, measured either by way of the profits, gross or net, realized by defendant, or on the theory of unjust enrichment of defendant.

For reasons hereinafter indicated, we have concluded that the judgment as to both plaintiff and defendant is correct and it will be affirmed.

### The Effect of the Substantial Evidence Rule

Preliminarily we note that "in examining the sufficiency of the evidence to support a questioned finding, an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is, under the rule which has always prevailed in this court, to be resolved in favor of the finding." (*Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157].) It has repeatedly been held that where the findings are attacked for insufficiency of the evidence the power of the appellate court "begins and ends with a determination as to whether there is *any* substantial evidence to support them; that we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom." (*Overton* v. *Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757].)

A review of the record before us, as it bears on both the first and third

contentions of defendant, indicates substantial evidence to support the findings hereinabove described. The Carpenter materials came from varying sources and in varying ways, but uniformly they related to the history, philosophy or professions of faith of the founder of the Christian Science religion or those closely related to her. Defendant concedes a close personal friendship between himself and the Carpenters. He lived in the Carpenter home. The Carpenters addressed him by his first name in terms of endearment. He was knowledgeable about the purposes for which plaintiff was formed. He expressed frequently, and in writing, his own understanding and conviction that the materials in question were unusual and extraordinary, described by him as "treasures," both in the sense that they were historically unique, and also in the sense that their substance contained deeper religious and philosophical content and import whose meaning, significance and value could be understood and accepted only by mature and "qualified" students of Christian Science. The record is clear that the Carpenters trusted defendant and in transmitting the materials to him considered that they were dealing not at arms length with a stranger but with "one of their own."

Most of the Carpenter materials were forwarded by plaintiff to defendant, commencing in 1946 and continuing into 1947. It was in June 1947 that defendant established "The London Unit of the Carpenter Foundation." Thereafter, the correspondence between the parties is replete with indications that the material being forwarded to defendant was for his use in connection with the London Unit. No attempt has been made to disengage or disconnect the London Unit from plaintiff's activities or operation. Thus, an agency was established and from this flow the usual incidents of fiduciary obligation.

The record supports the conclusion that, both as confidant and as agent, defendant knew that the materials came into his hands for a limited and restricted purpose. He would have found such limitation in the articles of plaintiff Foundation, wherein its purpose is directed to the assembly and dissemination of the materials to "qualified" students. He would have read it in the forewords or introduction of much of the Carpenter materials and in the copies of the prospectus of the Foundation, the platform of the Foundation and in numerous letters from Gilbert Carpenter, Jr., the founder and first president of the plaintiff. Defendant, of course, was responsible for the opening and the supervision of plaintiff's London Unit. His appreciation of his own status and the limitations which he considered imposed upon him are reflected and perhaps best described in the following language contained in a letter in evidence dated December 10, 1948, addressed by defendant to Gilbert Carpenter, Jr.: "However, insofar as any part of these items are your work or property, do we have permission

to do this? I am not sure legally whether this makes much difference, but I presume we would make solely private distribution, but would solicit contributions towards the costs (as opposed to making a charge). Could you let me have some statement giving me permission to reproduce Carpenter compilations on a given basis? . . ." The expression "private distribution" appears at several points in the correspondence between Gilbert Carpenter, Jr., and defendant at or about the time of the transmission of much of the material.

Defendant initially accepted the materials and complied with the requirements of a fiduciary in restricting their usage, access and circulation and in accounting for the limited distribution which he was making of the materials. Significantly, in our view, after the death of Messrs. Carpenter, Sr. and Jr., for the first time defendant, both in his personal correspondence and by means of the South African publication, evinced and asserted his claimed right of ownership of the papers, free of restriction, in forms and in ways totally contrary to his obligations as such fiduciary.

We agree with the trial court that the Carpenter materials were "entrusted" to defendant in the sense that they were given to him for a specific and limited purpose and upon both the express and implied representation that such purposes were fully understood and would be honored.

A review of the record before us indicates substantial evidence to support the findings of the trial court. By reason of the novelty and complexity of the issues presented, we go further, however, to consider the various arguments advanced by the parties in support of their respective appeals.

### Was There Violation of the Constitutional Guaranty of Freedom of Dissemination of Ideas?

■ No. Appellant claims the judgment constitutes a violation of the First Amendment of the United States Constitution abridging the freedom of speech or of the press. Numerous cases are cited wherein the well-established principles of freedom of speech and of the press are enunciated, including *New York Times Co.* v. *United States* (1971) 403 U.S. 713 [29 L.Ed.2d 822, 91 S.Ct. 2140].

A careful reading of the record and of the judgment reveals the fallacy of appellant's constitutional assertions. The trial court's injunction herein does not constitute an impairment either of freedom of speech or freedom of the press. The basis of the trial court's holding was a breach of a contractual relationship and one of trust and confidence. Defendant under the judgment is at perfect liberty to express himself, publicly or privately,

in writing or orally, on any subject, religious or otherwise, and in connection with any individual or issue. The limitation imposed upon him by the trial court affected only the dissemination for his own purposes, gain and advantage of literary material and literary property prepared and assembled by another and given to defendant under circumstances in which it found the character of agency, trust and confidentiality. Such a judgment finds ample support in the evidence before the court and in the case law.

### Defendant's Contention That the Judgment Grants Plaintiff a "Perpetual Monopoly"

■ Defendant asserts a broader contention that the effect of the trial court's judgment is to grant plaintiff a monopoly of the Carpenter papers that is both private and perpetual.

Our consideration of the case at this point requires an analysis of the legal nature of the Carpenter papers themselves. As indicated, some few of the papers had previously been published but by far the majority were previously unpublished. Although the record is not entirely clear, it appears that some small quantity had been copyrighted, but the greater portion had not been copyrighted. In this connection we quote from the trial court's memorandum of intended decision: "Some of the Carpenter materials have been copyrighted and some have not. . . . It is, however, apparent that the Foundation has secured a copyright on certain materials but has not generally published these materials. . . . The court is assuming for purposes of the decision that some of these materials are copyrighted." Some small portion of the documents was the original handiwork of the Carpenters, but by far the large part was non-Carpenter in origin. To what extent may plaintiff assert an ownership, protected by injunctive relief, in this amalgam of material, concededly assembled by plaintiff, but representing, as it does, the intellectual efforts of many others?

■ A review of the pertinent sections of the Civil Code, 980 through 985, describes the rights and liabilities that inhere in what is generally referred to as "common-law copyright." (*Smith* v. *Paul* (1959) 174 Cal. App.2d 744, 746 [345 P.2d 546].) For our purposes they furnish only a partial answer. We learn that the author or proprietor of a composition in letters owns exclusively the representation or expression of composition (Civ. Code, § 980); that such owner may transfer his ownership (Civ. Code, § 982); that if the owner publishes the composition, it may be used by any person, and that letters and private communications belong to the person to whom they are addressed but may not be published without the author's consent (Civ. Code, § 985).

The language of the Supreme Court in *Stanley* v. *Columbia Broadcasting System* (1950) 35 Cal.2d 653, 661 [221 P.2d 73, 23 A.L.R.2d 216], provides further guidance in the matter of copyright, both common law and statutory: "The common law right in literary property and the right existing under the copyright law are contrasted as follows: 'The term "copyright" is sometimes used to designate the property in intellectual productions conferred by the common law as well as that conferred by statute, the full phrase "common-law copyright" being sometimes used. The justification for this use of the term at the present day is found only in the fact that the common law confers on the owner of an intellectual production the exclusive right to make first publication of it, that is, the right to copy it in the first instance . . . . Whether the common law ever conferred a copyright in the sense of an exclusive right of continued publication and sale has been a matter of doubt and dispute, . . . but however this may be, the range of rights and liabilities existing at common law with respect to intellectual productions is essentially and greatly different from those existing under the copyright statutes. *Bobbs-Merrill Co.* v. *Straus*, 210 U.S. 339 [28 S.Ct. 722, 52 L.Ed. 1086]. Speaking generally, common-law rights are limited to unpublished works, and all common-law property rights therein are lost on a publication . . . while statutory copyrights relate mainly to published works, . . . ■ Again, *common law rights in unpublished works are of a wider and more exclusive nature* than the rights conferred by statutory copyright in published works. The common law prohibits any kind of unauthorized interference with, or use of, an unpublished work on the ground of an exclusive property right, and the common-law right is perpetual, existing until lost or terminated by the voluntary act of the owner, . . . while a statutory copyright permits a "fair use" of the copyright publication, without deeming it an infringement. . . .' [Italics added.] (18 C.J.S., Copyright and Literary Property, § 2, p. 138 et seq.; and cases there cited.)"

The Carpenter papers constituted a composite of written and printed material by and about Mary Baker Eddy and her students and followers, and as such comprised the literary and intellectual property initially of Mary Baker Eddy, her students and followers.

"Literary property" has been defined as the exclusive right of the owner to possess, use and dispose of intellectual productions (*Goldmark* v. *Kreling,* 25 F. 349; *Yadkoe* v. *Fields,* 66 Cal.App.2d 150 [151 P.2d 906]) and is said to denote the corporal property in which an intellectual production is embodied. (*Desny* v. *Wilder,* 46 Cal.2d 715 [299 P.2d 257].) It may consist of letters, lectures, sermons or addresses. (18 C.J.S. 142.) It is transferable, and the transferee becomes the lawful owner, unhindered

by the fact that he is not the author. ■ As was said in *Desny* at page 742, " '. . . Thus, a compiler, who merely gathers and arranges, in some concrete form, materials which are open and accessible to all who have the mind to work with like diligence is as much the owner of the result of his labors as if his work were a creation rather than a construction.' [Citations.]" Literary property rights may be terminated in varying ways, including the issuance of a statutory copyright. They may also be lost through publication. (Civ. Code, § 983; 18 C.J.S. 156.)

Such publication may be either general or limited. As was indicated in *Smith* v. *Paul, supra,* 174 Cal.App.2d at pages 749-750: "General publication has been defined as 'such a disclosure, communication, circulation, exhibition, or distribution of the subject of copyright, tendered or given to one or more members of the general public, as implies an abandonment of the right of copyright or its dedication to the public.' (*Werckmeister* v. *American Lithographic Co.* (1904), 134 F. 321, 324.) A limited publication is 'one which communicates a knowledge of its contents under conditions expressly or impliedly precluding its dedication to the public.' (*Idem*, p. 324.) The United States Supreme Court said in *American Tobacco Co.* v. *Werckmeister* (1907), 207 U.S. 284, 299-300 [28 S.Ct. 72, 52 L.Ed. 208]: 'It is a fundamental rule that to constitute publication there must be such a dissemination of the work of art itself among the public as to justify the belief that it took place with the *intention* of rendering such work common property.' (Emphasis added.)" Whether such publication is general or limited is determined by the intention of the publisher. (*Read* v. *Turner* (1966) 239 Cal.App.2d 504, 511 [48 Cal.Rptr. 919, 40 A.L.R. 3d 237].)

■ In the matter before us it is clear that any statutory copyright interests of either plaintiff or their parties in the Carpenter materials have expired by lapse of time. There remains for us to consider the matter of a common law copyright on the bulk of the material, on which there was no statutory copyright, and the determination of whether such rights in plaintiff have been lost by publication. It is apparently conceded that a small portion of the Carpenter materials, newspaper accounts, for example, have previously been given general publication. While such material, to the extent that it has been generally published, has lost its character and right to protection, here defendant by his action has commingled a small quantity of previously published material with a very large quantity of unpublished material and himself, and for his own purposes, published the aggregate of the material in the two volumes, "Divinity Course and General Collectanea," and "Essays and Other Footprints." A court whose equity powers are invoked cannot countenance the sprinkling of a relatively

small quantity of unprotected materials upon the greater body of the protected for the purpose of rendering unprotected the whole. The trial court quite properly enjoined the further publication or dissemination of the two volumes which contained certain fragments of previously published materials because of the impossibility of dissecting and segregating the protected from the unprotected in the published works.

Defendant contends further that the spirit and purpose of the copyright laws are negated and frustrated by the holding herein. Defendant's argument in this connection runs somewhat as follows: the Constitution authorized Congress to enact laws by which authors may be granted exclusive rights to literary works; the federal government has preempted the field, and in the absence of a copyright no other limitation may be imposed upon the dissemination of the written word whether by an author or one who collects or assembles the works of others; the trial court herein in granting an injunction permitted a "monopoly" of the expression contained in the Carpenter materials; the only monopoly permitted is that authorized by the federal Constitution, article I, section 8, subsection 8, granting such a monopoly "for limited times" only. The action of plaintiff or the Carpenters in publishing a small quantity of materials has constituted a waiver of the common law right to limit publication under Civil Code section 980 and following, and to allow a common law "trust" theory would defeat the federal law pertaining to copyrights.

The answer to such a series of contentions is contained in the words of Justice Cardozo in *Underhill* v. *Schenck* (1924) 238 N.Y. 7 [143 N.E. 773, 775, 33 A.L.R. 303], which case is acknowledged by defendant but is either unaccepted or misconceived by him, and which, though aged in point of years stems from such impressive authority and clothed in such unanswerable logic that we quote extensively therefrom: "We prefer, in upholding jurisdiction, to build upon a broader basis. The plaintiff does not rest his claim upon the infringement of any right of property secured to him by copyright in accordance with the act of Congress. One will read his complaint from the beginning to the end without finding an allegation that a copyright is his. The translation, for all that the complaint discloses, may remain unpublished in his desk. The fact of copyright and publication does, indeed, creep out in the course of the trial, but only incidentally and casually. What the plaintiff complains of in his controversy with Herndon is the breach of a duty attaching by implication of law to a fiduciary relation which has its origin in contract. Herndon is his licensee under covenant to produce the play upon the stage, the receipts to be divided in designated proportions. This fiduciary relation charged the fiduciary with a duty to refrain from forms of competition involving un-

fair diversion of royalties or profits. The position of such a one is analogous in this respect to the position of a partner. What he gains from a competing business, if the competition is so close as to transcend the bounds of fairness, he is not to keep for himself, but is to surrender to the joint adventure. [Citations.] This duty is quite apart from the duty of reparation that rests upon the infringer of a copyright. It would exist though no copyright law had ever been enacted. It has its origin, not in a right of property, but in a contract or relation. The author who suffers infringement of his copyright at the hands of a licensee may count upon the infringement as a tort, and seek redress under the statute by action in the federal courts. But that is not in all circumstances the only remedy available. If the same act is not merely an invasion of the statutory right of property, but is also the breach of a contract or the abuse of a relation, he may count upon the breach or the abuse, and have relief accordingly. When this is the ground of action, the courts of the state are not shorn of their competence."

Plaintiff by this action has invoked the equity powers of the court to prevent what it describes as continued abuse of a relationship, born in personal friendship, and maturing into the trust and confidence of a mutual religious commitment and program deeply shared. The trial court found in the facts an overreaching and an impairment of that trust and confidentiality in the misuse of the documents and written materials entrusted to defendant. It found more. It found a breach of the condition of an implied contract, the contract being the agreement by plaintiff or its predecessor to transmit the Carpenter papers to defendant, and the agreement by defendant to open the London Unit of plaintiff and to establish a reading room or library, the condition being that the dissemination of the Carpenter materials would be restricted to those students of Christian Science of proven, advanced, matured, seasoned qualification, in short, the "men" of the movement as opposed to the "babes."

It is established that liability for breach of a contract does not depend upon the "copyright protectibility" of the literary property if the elements of a contract are present. (*Chandler* v. *Roach* (1957) 156 Cal.App.2d 435, 442 [319 P.2d 776], citing *Desny* and *Stanley*.) Under these circumstances, plaintiff's remedy based upon the principle of *Underhill* v. *Schenck, supra,* 143 N.E. 773, is not restricted to nor dependent on an infringement of copyright law. Indeed, most of the material was not copyrighted. Whether it was copyrighted or not, plaintiff's right in the words of *Underhill* is "quite apart from the duty of reparation that rests upon the infringer of a copyright. It would exist though no copyright law had ever been enacted. It has its origin, not in a right of property, but in a contract or relation." This contract was breached, the relationship abused, and liability therefor must follow.

### Defendant Asserts That No Trust, Confidential Agency or Agreement Relationship was Established Between the Parties With Reference to the Materials

Defendant asserts that the evidence before the trial court did not disclose the existence of any relationship of trust or confidentiality, agency, or agreement between the parties with reference to the Carpenter materials. He claims that although Gilbert, Jr., and the defendant were close personal friends and shared a common interest in Christian Science, defendant's receipt of the materials and his subsequent distribution were "mere favors" between friends, and that, in effect, defendant had no way of knowing what was meant by plaintiff's use of the term "qualified students."

The record does not support defendant in such assertion. For reasons hereinabove expressed and in the light of documentary evidence hereinabove adverted to, we have no difficulty in finding a fiduciary relationship established not only by reason of the agency created in the operation of the London Unit of plaintiff, but also by virtue of the long, intimate, personal friendship of defendant with the Carpenters. The transmission of the papers involved more than a mere gratuitous token of friendship between acquaintances. Its purpose was clear. It was the necessary step to effect the goal, repeatedly discussed by the parties, of making available, in a new geographical area, documents and records of particular and unique value to the advanced and qualified students of a religious faith professed by the Carpenters and defendant.

### Is the Judgment Unduly Broad?

No. Defendant finally asserts that the judgment is unduly broad in its finding that plaintiff is the owner of the materials described in the judgment and in its recitation that the defendant is prohibited from copying the materials "regardless of source," while at the same time acknowledging that the defendant may well have a legal right to copy such materials.

The judgment found that plaintiff was the owner and entitled to possession of the Carpenter materials and further permanently enjoined defendant from producing, reproducing, publishing, distributing, advertising or disseminating any of the materials. These materials were specifically defined by title, and the source or origin of the materials is more specifically set forth in an appendix to respondent's brief containing a recitation of the exhibits, deposition or portion of the transcript defining with particularity their nature and origin. We find nothing in the record indicating that the judgment was "unduly broad." Its scope appears limited to those documents, records and papers which according to the relevant evidence are

identifiable as "Carpenter Materials," and which the trial court on proper evidence found was the property of plaintiff whose further dissemination or distribution by defendant it enjoined. Such injunction was proper. (Code Civ. Proc., § 526, subds. 1 and 6.) The court further found that it lacked sufficient information as to the exact extent of defendant's possession of Carpenter materials. To the extent that the defendant held possession or asserted control over Carpenter materials not described in the judgment it impressed a constructive trust upon any such materials, establishing plaintiff as the beneficiary of said trust. Such a remedy may be used by a court of equity, and the court's action is supported by both statutory and decisional authority. (Civ. Code, §§ 2223, 2224; *Edwards-Town, Inc.* v. *Dimin* (1970) 9 Cal.App.3d 87, 94 [87 Cal.Rptr. 726]; *McDaniel* v. *McDaniel* (1969) 275 Cal.App.2d 927, 942 [80 Cal.Rptr. 837]; *Blair* v. *Mahon* (1951) 104 Cal.App.2d 44, 50 [230 P.2d 832].) The trial court indicated in its intended decision that the defendant may well have a legal right to copy any of the "Carpenter Materials" that could be obtained from sources other than his relationship with the Carpenters or the Carpenter Foundation. Such an expression by the court in its intended decision may be used as a guide in the interpretation of the judgment. (*Mears* v. *Mears* (1960) 180 Cal.App.2d 484, 504 [4 Cal.Rptr. 618].)

Additionally, the court found that the contents of defendant's books, specifically, "Essays and Other Footprints," and "Divinity Course and General Collectanea," consist almost entirely of Carpenter materials identified in the pretrial conference order. Since such findings and conclusions of the trial court have not been attacked on appeal, and the court in its findings having found ownership in plaintiff of the documents in question, it is within its power to impose a trust on such property in the hands of defendant.

### *Plaintiff Asserts That it is Entitled to Recover Money Damages by Reason of Defendant's Breach of Trust*

Plaintiff urges that it is entitled to receive the gross proceeds received by the defendant in the sale of the Carpenter materials, or alternatively, the net profits realized by defendant on sale, and this without deduction for any expenses voluntarily paid by him while asserting a claim adverse to plaintiff.

Plaintiff offered no evidence of monetary damage caused by defendant's breach. It is elementary that a party claiming damage must prove that he has suffered damage and prove the elements thereof with reasonable certainty. (*Mendoyoma, Inc.* v. *County of Mendocino* (1970) 8 Cal.App.3d

873, 880 [87 Cal.Rptr. 740]; Civ. Code, § 3301; *Read* v. *Turner, supra,* 239 Cal.App.2d at p. 514.)

█ Notwithstanding plaintiff's claim that it is entitled to gross proceeds or net profits from defendant's sale of Carpenter materials, it has never sought an accounting from defendant, and asserts such demand for accounting for the first time on appeal. Whether based upon a claim of breach of agency contract or by reason of a breach of trust, plaintiff's right to accounting is contingent upon a demand therefor. (1 Witkin, Summary of Cal. Law, p. 410; 4 Witkin, Summary of Cal. Law, p. 2941.)

The court found that exact money damages were undetermined and also concluded that the defendant was not unjustly enriched. We find that such a determination was amply supported by the evidence. Although the testimony disclosed that the defendant made a net profit of $2,300 from his book enterprises in 1950, and on the sale of his two books a gross amount of $16,000 less the value of the stock of unsold copies of the books, these sums were applied to the expenses of reprinting the works and other expenses relating to the distribution of the books with an undetermined net profit from the books. Under the terms of the judgment, the unsold copies of the books, approximating 1,100, are to be delivered to plaintiff. There was substantial evidence from which the court could conclude that the defendant was not unjustly enriched, and that exact money damages were undetermined. (*City of Salinas* v. *Souza & McCue Construction Co.* (1967) 66 Cal.2d 217, 225 [57 Cal.Rptr. 337, 424 P.2d 921].)

The judgment is affirmed. Plaintiff-respondent, The Carpenter Foundation, is to recover its costs.

Friedman, J., and Regan, J., concurred.